UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Glenn L. Beane

      v.                        Civil No. 08-cv-236-JL
                                  Opinion No. 2011 DNH 012

Alan F. Beane

**OPINION AND ORDER**

This action represents one front in two brothers' long-running war over the failure of a company they owned, Mii Technologies, LLC.  Plaintiff Glenn L. Beane brought this action against defendant Alan F. Beane, seeking equitable relief under the Employee Retirement Income Security Act ("ERISA") to enforce certain obligations under an employee benefit plan created by Mii and a predecessor entity.  See 29 U.S.C. § 1132(a)(3)(B)(ii).  Glenn also sought relief under state law, including a declaration that his membership in Mii, a limited liability company, ceased as of February 2004.  Both of those claims have since been resolved, at least for purposes of this action:  Glenn has voluntarily dismissed his ERISA claim without prejudice, and Alan has consented to the entry of judgment on Glenn's claim for declaratory relief.  Order of March 22, 2010, at 3-4 (document no. 70).

The litigation continues, though, because Alan responded to Glenn's complaint (after initially moving to dismiss it but then

withdrawing the motion) with a counterclaim in 14 counts--which has since grown to 20 counts as the result of several separate amendments.  The gist of the counterclaim is that Glenn caused Mii's failure by mismanaging and then misappropriating a crucial customer relationship, as well as Mii's intellectual property.[1]

Part of Glenn's response to this accusation was to acquire, for what his attorney acknowledged were "principally strategic" reasons, an assignment of a bank's interest in an loan to Mii which had been secured by its accounts, inventory, equipment, and general intangibles, but was in default.  Glenn proceeded to make a purported disposition of some of the collateral--including the very causes of action asserted in the counterclaim here--by holding a public foreclosure auction.  Glenn was the high bidder.

---

[1]The numbered claims set forth in the second amended counterclaim are (1) breach of contract, (2) breach of implied covenants of good faith and fair dealing, (3) breach of fiduciary duties, (4) breach of fiduciary duty of loyalty, (5) "breach of fiduciary duty of care, diligence, full disclosure and advice," (6) "breach of confidential relationship," (7) misappropriation of trade secrets, (8) tortious interference with contractual relations, (9) tortious interference with prospective contractual relations of Mii, (10) "ownership of intellectual property," which seeks an injunction requiring Glenn to transfer certain rights to Mii, (11) unjust enrichment, (12) "unfair and deceptive trade practices and acts" in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A, (13) interference with prospective contractual relationships of Alan, (14) "civil conspiracy, aiding and abetting," (15) wrongful dissociation of Glenn from the Mii limited liability company, and (16) "constructive trust and specific performance."

He has since moved to substitute himself for Alan as the plaintiff-in-counterclaim, see Fed. R. Civ. P. 25(c), on the theory that the claims Alan purports to assert now actually belong to Glenn, and then to voluntarily dismiss those claims with prejudice, see Fed. R. Civ. P. 41(a)(2).[2]

Alan objects to this gambit on three principal grounds: (1) defects in the security agreement between the bank and Mii prevented the claims from becoming collateral for the loan in the first place, excluding them from whatever property Glenn foreclosed against and purchased, (2) even if the security agreement was effective as to claims belonging to Mii, most of the claims asserted in the counterclaim actually belong to Alan individually, and (3) Alan's pending personal bankruptcy, In re Beane, No. 06-5723 (Bankr. M.D. Fla. Oct. 19, 2006), made the foreclosure void as a violation of the automatic stay, see

---

[2]Since Glenn filed this motion, Alan has filed--with leave of court granted in the absence of any objection from Glenn--a third amended counterclaim asserting four additional numbered counts.  Glenn's motion to substitute and dismiss, though, is not directed at those counterclaims, so the court need not consider whether or not they were included in the collateral allegedly foreclosed against and purchased by Glenn.  In any event, because those claims arose out of Glenn's filing of this lawsuit, they did not exist at the time of the security agreement, so they could not have been included in it (at least insofar as they are commercial tort claims).  See N.H. Rev. Stat. Ann. § 382-A:9-204(b)(2) & official cmt. 4 ("In order for a security interest in a tort claim to attach, the claim must be in existence when the security agreement is authenticated.").

11 U.S.C. § 362(a)(3). Relying on these same theories, Alan has moved to amend his counterclaim yet again, to add claims for a declaratory judgment that the foreclosure did not include any of the other causes of action he asserts here, for damages as a result of Glenn's alleged violation of the automatic stay, see id. § 362(k)(1), and for avoidance of Glenn's acquisition of any of Alan's claims, see id. § 544(a). Finally, based on his view that the counterclaims actually belong to Mii, not to Alan, Glenn has moved for Mii's involuntary joinder as a plaintiff-in-counterclaim. See Fed. R. Civ. P. 19(a)(2).

As this court previously determined, it has subject-matter jurisdiction over Glenn's state-law claims against Alan under 28 U.S.C. § 1332(a)(1) (diversity), because Glenn is a New Hampshire citizen, Alan is a Florida citizen, and Mii is not a necessary party-defendant to those claims, so its citizenship is irrelevant. Order of March 22, 2010, at 2 (document no. 70). As a result, this court can exercise supplemental jurisdiction over Alan's counterclaims against Glenn, see 28 U.S.C. § 1367(a), even though "most if not all" of those claims in fact belong to Mii, see Order of March 22, 2010, at 3 (document no. 70), and has elected to do so, based on the expressed preference of both Beanes for this forum.

4

For the reasons explained fully <u>infra</u>, both Glenn's motion to substitute and Alan's motion to amend are denied, and Alan's motion to join Mii as a plaintiff-in-counterclaim is denied in favor of alternative relief.  Alan is correct that the security agreement between Mii and the bank failed to describe any commercial tort claims with the detail required by New Hampshire's version of the Uniform Commercial Code.  <u>See</u> N.H. Rev. Stat. Ann. § 382-A:9-108(e)(1).  So no such claim was included in the collateral Glenn foreclosed on and purchased at auction and, while it is possible that the counterclaim asserts causes of action that do not qualify as commercial tort claims under the Code, Glenn does not attempt to make that argument and therefore has failed to carry his burden to show a security interest in any claims that are not for commercial torts.  This ruling moots Alan's proposed additional claims to avoid the foreclosure and for a declaration that it did not encompass the counterclaim asserted here.

Alan's proposed claim that the foreclosure violated the automatic stay put in place by his bankruptcy is futile, because the foreclosure gave Glenn possession of <u>Mii's</u> property, which is by definition not property of <u>Alan's</u> bankruptcy estate.  <u>See</u> 11 U.S.C. § 362(a)(1).  Finally, because this court already ordered that Mii be joined as a plaintiff-in-counterclaim, <u>see</u> Order of

March 22, 2010, at 3 (document no. 70), and Alan has not offered any explanation as to why this has yet to happen, he must cause Mii's joinder or explain why particular causes of action in the counterclaim belong to him personally within 30 days or suffer the dismissal of the counterclaim with prejudice.

## I.   <u>Background</u>

Alan filed the first version of the counterclaim against Glenn in this action in October 2008.  Alan had previously asserted many of the same causes of action in a lawsuit he and Mii commenced against Glenn (and a company he owns, Glenn L. Beane, LLC) in this court in 2006, but which was dismissed in April 2008 for lack of subject-matter jurisdiction.  <u>Beane v. Beane</u>, 2008 DNH 082 (McAuliffe, C.J.).  In reaching this conclusion, Chief Judge McAuliffe rejected the argument that Mii was a nominal party whose citizenship should be disregarded for purposes of diversity jurisdiction, ruling that "[t]he rights upon which plaintiffs base their claims are Mii's rights, and the remedies sought would directly benefit Mii," <u>id.</u> at 15-16 (footnote omitted), and that "Mii is a party that possesses, and seeks to vindicate, its own rights," <u>id.</u> at 15 n.10.

Following the dismissal of that action, Glenn commenced this action against Alan in June 2008.  Around the same time, he also

commenced an action against Mii and other parties in Grafton
County Superior Court.  Beane v. Mii Techs., LLC, No. 2008-C-079
(N.H. Super. Ct. June 10, 2008).  As just noted, Alan filed the
counterclaim against Glenn in this action around October 2008
and, around the same time, Alan and Mii commenced their own
Grafton County Superior Court action against Glenn.  Beane v.
Beane, No. 08-E-270 (N.H. Super. Ct. Oct. 20, 2008).  The claims
in that case (which has since been stayed pending the outcome of
this one) are substantially similar to Alan's counterclaims in
this case, as well as to his and Mii's claims against Glenn in
the prior lawsuit they brought in this court.

      Glenn explains that, faced with these multiplicitous (and,
he says, frivolous) suits, he attempted to "take advantage of a
simple procedure to terminate the litigation:"  acquiring the
very claims asserted against him by purchasing Mii's outstanding
debt to Laconia Savings Bank, then foreclosing against the
collateral, which allegedly included the claims.  On November 26,
2004, Mii had borrowed $100,000 from Village Bank and Trust
Company, a predecessor to Laconia Savings, repayable in monthly
installments over the next ten years.  The promissory note
documenting this debt identifies the loan as number 6673-02, a
"renewal of 6673-01," and states that it "is separately secured
by:  SA-BUS and UCC-3 & UCC-1 previously filed."

Together with the note, Glenn has submitted two forms each labeled "SA-BUS" and entitled "Commercial Security Agreement" between Mii and Village Bank.  The first of these, dated June 30, 2004, states that it secures "loan #6673-01 for $100,000 . . . maturing 10/30/04" (capitalization corrected), while the second, dated November 26, 2004, states that it secures "loan #6673-02 . . . maturing 11/16/14."  Thus, as Glenn explains (without the benefit of direct evidence, but also without contradiction by Alan), the November 2004 "loan" was in fact "not a fresh transaction" but an extension of Mii's time to repay a debt it had incurred in June 2004.[3]

The November 2004 note, as well as both the June 2004 and November 2004 security agreements, each contain a signature line for "M.I.I. Technologies, L.L.C." by "Alan F. Beane, President." On both the June note and the November security agreement, the word "President" has been struck through and the phrase "Secured Creditor in Possession" written in its place, and Alan's signature appears on the signature line.  The November security agreement, however, bears no signature on behalf of either party.

---

[3]While the note evidencing the June 2004 loan has not been submitted to the court, the security agreement and Alan's personal guarantee have.

Each of the security agreements gave the bank a security interest in certain "Property described in this Agreement that Debtor owns or has sufficient rights in which to transfer an interest, now or in the future."  The property described included, in relevant part:

> **Accounts and Other Rights to Payment:**  All rights to payment, whether or not earned by performance, including, but not limited to, payment for property or services sold, leased, rented, licensed, or assigned. This includes any rights and interests (including all liens) which Debtor may have by law or agreement against any account debtor or obligor of Debtor.

. . .

> **General Intangibles:**  All general intangibles including, but not limited to, tax refunds, patents and applications for patents, copyrights, trade secrets, goodwill, trade names, customer lists, permits and franchises, payment intangibles, computer programs and all supporting information provided in connection with a transaction relating to computer programs, and the right to use Debtor's name.

Each of the security agreements also contained a "Specific Property Description" stating that the "Property includes, but is not limited by," particular UCC-1 forms on file with the New Hampshire Secretary of State.  Insofar as these filings have been submitted here, they do not make reference to any commercial tort claims by Mii, and neither do the security agreements themselves.

Around February 2008, Glenn, through counsel, began corresponding with Laconia Savings about purchasing an assignment

of its interest in Mii's debt.  During these negotiations, Glenn's counsel stated that the value of the assignment to his client was "principally strategic, not collection," and Laconia Savings stated that it had no executed version of the November 2004 security agreement.  The parties ultimately agreed that the bank would assign the debt to Glenn for $7,000 and executed an "Assignment of Loan and Loan Documents" to that effect.[4]

Glenn then sent a "Notification of Public Disposition of Collateral" to Alan and Mii in October 2009.  This document stated that Glenn, "the holder of Loan and Note No. 6673-02, originally made by Mii Technologies, LLC to Village Bank and Trust Company, which loan and note are in default," would sell specified "collateral" in a public auction to be held at the office of Glenn's attorney on January 15, 2009.  The "collateral" identified was "[a]ny and all claims owned by Mii Technologies, LLC against Glenn L. Beane and/or Glenn L. Beane, LLC."  The auction proceeded as scheduled, and Glenn was the highest bidder, at $1,000.  (If any other potential bidders attended, the record

---

[4]Though the agreement itself recites Glenn's payment of one dollar "and other good and valuable consideration," the parties had in fact agreed in their discussions that "the full consideration is $7,000."  This was done to accommodate Glenn's counsel's preference for "a document I can attach as an exhibit to a pleading which doesn't indicate how much we're paying."  Suffice it to say that this tactic proved ineffective.

does not reflect it.)  Glenn executed a bill of sale to himself for "[a]ny and all claims owned by Mii Technologies, LLC against Glenn L. Beane and/or Glenn L. Beane, LLC" and wrote himself a check for the purchase price.

A few months later, in April 2009, Glenn filed the instant motion to substitute himself as the plaintiff-in-counterclaim on Alan's claims against him.  After filing an objection, as outlined supra, Alan commenced an adversary proceeding against Glenn in the Bankruptcy Court claiming that, by foreclosing on the loan to Mii, he had violated the automatic stay imposed by Alan's bankruptcy.  Beane v. Beane (In re Beane), No. 09-296 (Bankr. M.D. Fla. May 4, 2009).  Though the parties filed cross-motions for summary judgment, they ultimately agreed to dismiss the adversary proceeding without prejudice so that Alan could pursue his claim against Glenn as part of this action.[5]  Around the same time, Alan filed his instant motion to amend his counterclaim to seek relief from the foreclosure.

In the meantime, this court stayed this action pending its receipt of a copy of the Grafton County Superior Court's final

---

[5]In endorsing this procedure, the Bankruptcy Court noted that it "ma[de] no determination and express[ed] no opinion on the validity of [Alan's] claims or prayers or on either party's motion for summary judgment."  Beane v. Beane (In re Beane), No. 09-296 (Bankr. M.D. Fla. June 4, 2010).

order in Glenn's case against Mii (the pendency of which Alan had
raised as a basis for his initial motion to dismiss this action).
As a result of the stay, the court denied Glenn's motion to
substitute himself as the plaintiff-in-counterclaim (and all
other pending motions) without prejudice.  Order of Aug. 3, 2009
(document no. 59).

     After reviewing the Superior Court's order, and receiving a
motion by Alan to lift the stay as well as a motion by Glenn for
voluntary dismissal of his ERISA claim, this court held a status
conference to discuss a number of outstanding issues, including
whether it would lack subject-matter jurisdiction in the absence
of the ERISA claim on the theory that Mii was an indispensable
party to Glenn's state-law claims.  See Order of March 5, 2010
(document no. 69).  In its order identifying these issues, the
court noted,

> It appears that Mii is the real party in interest to a
> number of Alan's counterclaims, as Chief Judge
> McAuliffe ruled in dismissing Alan's previous suit in
> this forum, which asserted those counterclaims as
> claims against Glenn, for lack of subject-matter
> jurisdiction.  In fact . . . , that ruling appears to
> collaterally estop Alan from arguing to the contrary.

Id. at 6 n.3 (citation omitted).

     As a result of its discussion with counsel at the ensuing
conference, the court determined that Glenn's voluntary dismissal
of his ERISA claim would not deprive the court of subject-matter

12

jurisdiction, because Mii was not an indispensable party to Glenn's state-law claims, creating diversity jurisdiction over those claims and authorizing supplemental jurisdiction over Alan's counterclaims.  Order of March 22, 2010, at 2 (document no. 70).  The court also ruled, however, that Mii "shall be added as a plaintiff-in-counterclaim, because most if not all of the counterclaims asserted by Alan actually belong to Mii, as this court has previously ruled." Id. at 3 (citing Beane, 2008 DNH 082, 14-16).  That has not happened over the intervening nine months.  In the same order, the court lifted the stay and reinstated Glenn's motion to substitute, together with the supporting memorandum, objection, reply, and surreply. Id. at 4-5.

## II.  **Analysis**

### A.  **Glenn's motion to substitute**

Rule 25 provides that "[i]f an interest is transferred, the action may be continued by or against the original party unless the court, on motion, orders the transferee to be substituted in the action." Fed. R. Civ. P. 25(c).  Casting himself as the transferee of the claims asserted against him here by virtue of the foreclosure and auction, Glenn seeks to be substituted for Alan as the plaintiff-in-counterclaim and, following this

13

substitution, to exercise his prerogative to dismiss the counterclaim voluntarily under Rule 41(a)(2).[6]

In addition to his many substantive objections to this relief, Alan argues that, because Glenn seeks dismissal of the counterclaim following the substitution, his motion should be treated as a motion to dismiss under Rule 12(b)(6), with the result that materials outside the pleadings cannot be considered. See, e.g., Trans-Spec Truck Serv., Inc. v. Caterpillar Inc., 524 F.3d 315, 320-21 (1st Cir. 2008). But, as one court has observed, Rule 25(c)--unlike Rule 12(b)(6)--"does not specify a method for deciding motions or a standard to use in determining whether a motion can be decided on the papers," leaving courts the discretion to use any procedure sufficient "to accord due process to the parties." Luxliner P.L. Exp., Co. v. RDI/ Luxliner, Inc., 13 F.3d 69, 72 (3d Cir. 1993).

That court went on to hold that if the record on a Rule 25(c) motion discloses "one or more genuine issues of material

---

[6]Glenn also invokes Rule 17(a), which requires the court, before dismissing an action that is not prosecuted in the name of the real party in interest, to allow that party a reasonable time "to ratify, join, or be substituted into the action." Fed. R. Civ. P. 17(a)(3). But "[w]here, as here, there has been a transfer of interest during the pendency of the action, the court must apply Rule 25(c), rather than Rule 17, to determine whether a substitution of parties should occur." Pacamor Bearings, Inc. v. Minebea Co., 892 F. Supp. 347, 360 (D.N.H. 1995).

fact, due process requires that a district court judge hear the evidence to assess for himself the credibility, or lack thereof, of one side as opposed to the other." Id. In the absence of a genuine factual dispute, however, the court can simply grant the motion, even if doing so would affect the liability of one side or the other (just like a court does when it grants a motion for summary judgment under Rule 56). See id. at 72-73.

The record here permits this summary-judgment type approach: while the parties disagree sharply over the legal significance of the facts underlying the motion, by and large they do not disagree over the facts themselves. Cf. DiMercurio v. Sphere Drake Ins. Co., 202 F.3d 71, 74 (1st Cir. 2000) (noting that summary judgment is appropriate in that context). The court can therefore rule on Glenn's motion to substitute by looking to materials beyond the pleadings, and without conducting an evidentiary hearing. See Luxliner, 13 F.3d at 72.

Under New Hampshire's version of the Uniform Commercial Code, "a security interest is enforceable against the debtor and third parties with respect to the collateral only if," in relevant part, "the debtor has authenticated a security agreement that provides a description of the collateral." N.H. Rev. Stat.

15

Ann. § 382-A:9-203.[7]  Alan argues that the alleged security
interest in the counterclaim is not enforceable because Mii's
security agreements with the bank were neither authenticated nor
provided the requisite description of the collateral.  The court
need not reach the first argument because the second one is
correct, at least so far as the counterclaim asserts commercial
tort claims.

While "a description of personal or real property is
sufficient, whether or not it is specific, if it reasonably
identifies what is described," that rule is subject to certain
exceptions.  Id. § 382-A:9-108(a).  One of those exceptions is
that "[a] description only by type of collateral defined [in
Article 9] is an insufficient description of . . . a commercial
tort claim."  Id. § 382-A:9-108(e)(1).  As the official code
commentary explains, this provision "does not require a
description to be specific.  For example, a description such as
'all tort claims arising out of the explosion of debtor's
factory' would suffice."  Id. cmt. 5.

Glenn argues that the causes of action set forth in the
counterclaim are sufficiently described in the provisions of the
security agreements defining the collateral to include "Accounts

---

[7]The parties agree that New Hampshire's version of Article 9
of the Code controls the effect of the security agreement here.

16

and Other Rights to Payment" and "Payment Intangibles."  But
those provisions do not even refer to commercial tort claims by
type, let alone contain the additional description required by
§ 108(e)(1).  Nor, for that matter, does anything else in the
agreements or the incorporated UCC filings.  Mii's security
agreements with the bank, then, were not effective to convey
security interests in any of those claims under § 9-203.  See
Helms v. Certified Packaging Corp., 551 F.3d 675, 681 (7th Cir.
2008).  Furthermore, Glenn's argument that commercial tort claims
can amount to "rights to payment" or "payment intangibles" is
foreclosed by the official code commentary, which explains that
it is not until such a claim "has been settled and reduced to a
contractual obligation to pay" that the resulting "right to
payment becomes a payment intangible and ceases to be a claim
arising in tort."  N.H. Rev. Stat. Ann. § 382-A:9-109 cmt. 15;
see also In re Zych, 379 B.R. 857, 864 n.7 (Bankr. D. Minn. 2007)
(rejecting the same argument).

It is perhaps less clear whether all of the 16 separately
numbered counts set forth in the second amended counterclaim
qualify as "commercial tort claims" under the Code.  Article 9
defines "commercial tort claim," in relevant part, as "a claim
arising in tort with respect to which . . . the claimant is an
organization."  N.H. Rev. Stat. Ann. § 382-A:9-102(a)(13)

(formatting altered).  While there is no question that Mii is an "organization," there might be some question as to whether every count asserted in the counterclaim is "a claim arising in tort." <u>See</u> note 1, <u>supra</u>.  But this is not a question that Glenn attempts to answer, even though Alan asserts in his objection to Glenn's motion that all of the counts fit that description, and even though a party claiming a security interest in another's property generally bears the burden of proving that the security interest exists.  <u>See</u>, <u>e.g.</u>, <u>Simon v. Chrysler Credit Corp. (In re Babaeian Transp. Co.)</u>, 206 B.R. 536, 549 (Bankr. C.D. Cal. 1997); <u>State Sav. Bank v. Allis-Chalmers Corp.</u>, 431 N.W.2d 383, 386 (Iowa Ct. App. 1988); <u>McKinley v. State Dep't of Motor Vehicles</u>, 39 P.3d 920, 924 (Or. Ct. App. 2002).  Indeed, Glenn's filings say nothing whatsoever in response to Alan's argument that his claims are for commercial torts.

Because Mii's agreements with the bank did not give it a security interest in any commercial tort claims, and because Glenn has not carried his burden to show that the counterclaim asserts any non-tort claims against him, he has failed to show that he is a "transferee" of the counterclaim under Rule 25(c). His motion to substitute himself as the plaintiff-in-counterclaim and then to dismiss the counterclaim voluntarily is denied.

18

**B.   Alan's motion to amend**

For his part, Alan moves to amend his counterclaim to add counts for (1) a declaratory judgment that, for a number of reasons, Glenn's foreclosure on the bank's loan to Mii did not include any of the claims set forth in the counterclaim, (2) avoidance of any "security interests purportedly foreclosed" by Glenn under 11 U.S.C. § 544(a), and (3) relief against Glenn on the theory that the foreclosure violated the automatic stay imposed by Alan's bankruptcy filing, see id. § 362(a), including "compensatory damages and equitable relief," see id. § 362(k)(1). Glenn objects to the amendment on various grounds, including that, by seeking to add claims challenging the validity of the foreclosure, Alan is trying to sidestep the motion to substitute.

Regardless of the amendment's intended purpose, the fact remains that the court is denying the motion to substitute because Glenn has failed to show that the foreclosure extended to any of the causes of action set forth in the counterclaim.  This ruling moots Alan's proposed counterclaims for a declaration that the foreclosure did not in fact extend to those claims and for avoidance of the foreclosure.  The ruling also moots Alan's proposed counterclaim alleging that the foreclosure violated the automatic stay, at least insofar as that counterclaim seeks "equitable relief" on that basis.  So Alan's motion to amend is

denied as moot insofar as it seeks to add these claims for
equitable relief from the foreclosure.

Alan also seeks compensatory damages for Glenn's alleged
violation of the automatic stay.  This claim is not moot, but it
is futile.  As the court of appeals has held, "futility is fully
sufficient to justify the denial of a motion to amend."  Hatch v.
Dep't for Children, Youth & Their Families, 274 F.3d 12, 19 (1st
Cir. 2001).  Where, as here, an amendment is proffered before
"discovery has been closed and a summary judgment motion has been
docketed," futility "is gauged by reference to the liberal
criteria of Federal Rule of Civil Procedure 12(b)(6)," governing
motions to dismiss for failure to state a claim.  Id.  Under this
standard, "a complaint must contain sufficient factual matter,
accepted as true, 'to state a claim to relief that is plausible
on its face.'"  Iqbal v. Ashcroft, 129 S. Ct. 1937, 1949 (2009)
(quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).
Alan's proposed counterclaim alleging that Glenn violated the
automatic stay does not meet this standard.

With a number of exceptions not relevant here, the
Bankruptcy Code provides that the filing of a bankruptcy petition
"operates as a stay, applicable to all entities, of . . . any act
to obtain possession or property of the estate or to exercise
control over property of the estate," among other actions.  11

U.S.C. § 362(a)(3) (formatting altered).  The Code also provides
(again, with an exception not relevant here) that "an individual
injured by any willful violation of a stay provided by this
section shall recover actual damages, including costs and
attorneys' fees, and, in appropriate circumstances, may recover
punitive damages."  Id. § 362(k)(1).

As one of his proposed counterclaims, Alan alleges that
Glenn willfully violated the automatic stay imposed when Alan
filed for bankruptcy, because the foreclosure amounted to an "act
to obtain possession of property of the estate or to exercise
control over property of the estate" under § 362(a)(3).  The most
glaring problem with this theory is that, through the foreclosure
and auction, Glenn purported to obtain only "claims owned by Mii
Technologies, LLC against Glenn L. Beane and/or Glenn L. Beane,
LLC."  He did not purport to obtain any claims owned by Alan
individually.  Indeed, Alan himself points out that the documents
effecting the loan to Mii "never granted [the bank] a security
interest in any . . . personal property owned by him" personally,
so that neither the bank nor Glenn "held or ever could possibly
have held any security interest" in his claims against Glenn.[8]

_____

[8]It follows that, even if certain of the causes of action
set forth in the counterclaim belong to Alan individually, the
foreclosure and auction did not violate the automatic stay.

Section 362(a)(3), by its terms, applies the automatic stay to acts "to obtain possession of . . . or to exercise control over property of the estate" (emphasis added).  The Code defines "property of the estate" to include, among other things, "all legal or equitable interests of the debtor in property as of the commencement of the case."  Id. § 541(a)(1).  Though, as Alan emphasizes, this provision "is construed broadly," Abboud v. Ground Round, Inc. (In re Ground Round, Inc.), 482 F.3d 15, 17 (1st Cir. 2007), it does not bring Mii's claims against Glenn into Alan's bankruptcy estate.

In applying § 541(a)(1), courts look to state law to determine "the existence and extent of the debtor's interest" in particular property.  Id. (citing Butner v. United States, 440 U.S. 48, 54-55 (1979)).  New Hampshire law expressly provides that, while "[a] limited liability interest is intangible personal property," an individual "member has no interest in limited liability company property."  N.H. Rev. Stat. Ann. § 304-C:45.  So Alan has no ownership interest in any of Mii's property, including its claims against Glenn.

It follows that those claims are not property of his bankruptcy estate under § 541(a)(1).  In fact, a number of courts have ruled that property owned by the debtor's limited liability company was not property of his bankruptcy estate.  See, e.g., In

22

re Brittain, 435 B.R. 318, 322 (Bankr. D.S.C. 2010); Harder v.
Premierwest Bank (In re Harder), 413 B.R. 827, 835 (Bankr. D. Or.
2009); In re HSM Kennewick, L.P., 347 B.R. 569, 571-72 (Bankr.
N.D. Tex. 2006); Assocs. Commercial Corp. v. Rodio (In re Rodio),
257 B.R. 699, 701 (Bankr. D. Conn. 2001).  Alan provides no
authority to the contrary.  Instead, he argues that he personally
owns Mii's claims against Glenn because (a) Mii "no longer
transacts business," (b) Alan's bankruptcy estate is Mii's
"largest creditor," and (c) he "took possession of all of the
assets" of Mii in February 2004.  These arguments are unavailing.

First, while Mii was administratively dissolved by the New
Hampshire Secretary of State in 2007, that action did not
terminate its existence, but prohibited it from "carry[ing] on
any business except that necessary to wind up and liquidate its
business and affairs," N.H. Rev. Stat. Ann. § 304-C:53, II,
including to "[p]rosecute and defend suits," id. § 304-C:56,
II(a); cf. Embassy Software Corp. v. eCopy, Inc., 592 F. Supp. 2d
225, 230-33 (D.N.H. 2009) (applying identical provisions of New
Hampshire's Corporations Act).  Mii's dissolution, then, did not
simply drop its claims against Glenn into Alan's lap:  at most,
it allowed him to bring those claims "in the name of, and for and
on behalf of, the limited liability company."  N.H. Rev. Stat.
Ann. § 304-C:56, II(a).

Second, and relatedly, Alan's claimed status as Mii's "largest creditor" (even if accurate) does not give him ownership of the company's assets either.  While New Hampshire law authorizes the distribution of a limited liability company's assets to "members who are creditors in satisfaction of [its] liabilities," that cannot occur without the prior issuance of a certificate of dissolution from the Department of Revenue.  Id. §§ 304-C:58, I-II(a).  There is no indication that has occurred and, even if it had, Alan could still not necessarily convey Mii's claims against Glenn to himself.  See id. § 304-C:44, I (preventing distributions to members when the company's remaining assets would be insufficient to satisfy its other liabilities).

Third, Alan's claim that he "took possession" of Mii's assets in February 2004 (even if accurate) does not itself give him ownership of its claims against Glenn.  Alan argues that, by doing so, he effectively "foreclosed" on his security interest in any claims against Glenn.  But Alan's security agreement with Mii did not even mention any commercial tort claims against Glenn, let alone sufficiently describe them as required by N.H. Rev. Stat. Ann. § 382-A:9-108(e)(1), and Alan, like Glenn, does not identify any non-tort claims in his counterclaim.[9]  To the

---

[9]Furthermore, the security agreement is dated January 2002, before the claims against Glenn even arose.  See note 2, supra.

contrary, in opposing Glenn's motion to substitute, Alan argues that <u>all</u> of the causes of action set forth in the counterclaim are commercial tort claims.  <u>See</u> Part II.A, <u>supra</u>.  So Alan is hoist on his own petard.  Because the security agreement with Mii does not sufficiently describe its claims against Glenn, they were not included in the collateral on which he allegedly "foreclosed" in February 2004 and therefore do not belong to him (aside from any other potential problems with this argument, which this court need not and does not reach yet).

To recap, Glenn foreclosed against and bought at auction only Mii's claims against him, and those claims indeed belong to Mii, not to Alan personally.  So this was not an act to obtain possession or control of or to exercise control over "property of the estate" of Alan's bankruptcy under § 541(a), and therefore not a violation of the automatic stay under § 362(a)(3).  Alan's proposed counterclaim for damages against Glenn under § 362(a)(3) is futile.  Because, as already discussed, his other proposed counterclaims are moot, his motion to amend is denied altogether.

## C.   Glenn's motion to add Mii as a plaintiff-in-counterclaim

Finally, Glenn has filed a motion for Mii's involuntary joinder as a plaintiff-in-counterclaim, arguing that its continued absence is creating unnecessary uncertainty over this

court's ability to adjudicate the counterclaims.  The court

agrees.  Indeed, this court has already ruled that Mii "shall be

added as a plaintiff-in-counterclaim, because most if not all of

the counterclaims asserted by Alan actually belong to Mii, as

this court has previously ruled."  Order of Mar. 22, 2010, at 3

(document no. 70) (citing Beane, 2008 DNH 082, 14-16).  The court

issued this ruling, moreover, following a status conference with

counsel, at which it expressed its view (as it had done in a

prior written order) that Mii should be joined as a plaintiff-in-

counterclaim and counsel for Alan--Mii's sole remaining member--

offered no objection to that course of action.  Yet, more than

ten months later, Mii has yet to be joined, and Alan has not

explained why (he filed no response to Glenn's motion for

joinder).

     The court notes that, in objecting to Glenn's motion for

substitution, Alan does argue that some of the causes of action

in the counterclaim belong to him individually, rather than to

Mii.  But that argument does not address Chief Judge McAuliffe's

previous ruling that the claims set forth against Glenn in the

Beanes' prior lawsuit in this court (which, again, are

substantially similar to those set forth in the counterclaim

here) are founded upon Mii's rights, not Alan's--nor this court's

view that the ruling collaterally estops Alan from arguing to the

26

contrary here.  Even without regard to these prior rulings, moreover, Alan's argument addresses only some of the causes of action set forth in the counterclaim, not all of them.

Accordingly, within 30 days of this order, Alan shall either (1) cause Mii's joinder as a plaintiff-in-counterclaim or (2) file a memorandum, not to exceed 25 pages, explaining in detail which of the numbered causes of action set forth in the third amended complaint belong to him personally, taking into account Chief Judge McAuliffe's prior ruling and its collateral estoppel effect, as just discussed.  Glenn will then have 14 days to file a responsive memorandum, if he chooses, not to exceed 15 pages.  The court will thereafter rule on which causes of action, if any, belong to Alan, and dismiss the remaining causes of action without prejudice.  If Alan neither joins Mii nor files the memorandum on or before the deadline, the counterclaim shall be dismissed <u>with prejudice</u> in its entirety.  This relief, which will ensure that Glenn is not forced to defend himself against claims that only a non-party can properly assert, moots his motion for the involuntary joinder of Mii as a plaintiff-in-counterclaim toward that end.

## III. **Conclusion**

For the foregoing reasons, Glenn's motion for substitution and voluntary dismissal[10] is DENIED, Alan's motion to amend his counterclaim[11] is DENIED, and Glenn's motion for involuntary joinder[12] is DENIED as moot in light of the alternative relief ordered in Part II.C.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  January 24, 2011

cc:  W.E. Whittington, Esq.
     William S. Gannon, Esq.

---

[10]Document no. 42.

[11]Document no. 75.

[12]Document no. 73.