UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Glenn L. Beane

     v.                            Civil No. 08-cv-236-JL
                                     Opinion No. 2012 DNH 049

Alan F. Beane
and Mii Technologies, L.L.C.

**OPINION AND ORDER**

If this battle between brothers over their failed business does not quite reach Biblical proportions, cf. Genesis 4:1-16 (Cain and Abel), mythical proportions, cf. Plutarch, Plutarch Lives, I, Theseus and Romulus, Lycurgus and Nurma, Solon and Pulicola (1914) (Romulus and Remus), or even modern pulp literary proportions, cf. Mario Puzo, The Godfather (1969) (Michael and Fredo Corleone, also popularized on film), it easily equals the great "brother versus brother" storylines of professional wrestling,[1] at least in its bombast.  Following the collapse of the business, Mii Technologies, L.L.C., the brothers, Glenn L. and Alan F. Beane (with Alan acting on behalf of either himself or Mii) have squared off in at least eight separate proceedings in at least three different courts.  See Beane v. Mii Techs., LLC, No. 10-307 (D.N.H. June 4, 2010); Beane v. Beane, No. 06-446

---

[1]These would include, at a minimum, Rick Steiner vs. Scott Steiner, Bret Hart vs. Owen Hart, The Undertaker vs. Kane, and Matt Hardy vs. Jeff Hardy.

(D.N.H. Nov. 30, 2006); <u>Beane v. Beane (In re Beane)</u>, No. 09-269 (Bankr. M.D. Fla. May 4, 2009); <u>Lawson & Persson, P.C. v. Beane</u>, No. 09-E-113 (N.H. Super. June 15, 2009); <u>Beane v. Mii Techs., LLC</u>, No. 08-157 (N.H. Super. Nov. 10, 2008); <u>Beane v. Beane</u>, No. 08-E-270 (N.H. Super. Oct. 20, 2008); <u>Beane v. Mii Techs., LLC</u>, No. 08-C-79 (N.H. Super. June 10, 2008).

This particular action was commenced by Glenn, but, as explained <u>infra</u>, Alan has since consented to the entry of judgment on one of Glenn's claims--seeking a declaration that Glenn's membership in Mii ceased as of February 4, 2004--and the rest (with one minor exception) have been dismissed, either by Glenn or the court. <u>See</u> Order of March 22, 2010 (document no. 70). Alan, however, responded to Glenn's complaint in this action with a counterclaim in 14 counts, which has since grown to 21 counts as the result of several separate amendments. Alan has also joined Mii as a party to the counterclaim, as ordered by the court. <u>See</u> <u>id.</u>[2]

--------

[2]Though the court initially ordered Alan to join Mii in March 2010, he did not immediately do so, leading Glenn to file a motion for Mii's involuntary joinder. The court eventually denied that motion as moot when it ordered Alan--on pain of dismissal of the counterclaim--either to join Mii, as had been previously ordered, or to file a memorandum explaining which counts of the counterclaim belonged to him, rather than to Mii. <u>Beane v Beane</u>, 2011 DNH 012, at 27. In response, Alan promptly joined Mii as a plaintiff-in-counterclaim. Nevertheless, Glenn then moved to dismiss, arguing that Alan had failed to file the

The gist of the counterclaim is that Glenn caused Mii to fail through a variety of wrongful conduct, <u>viz.</u>, mismanaging, its relationship with a key customer, Lovejoy, Inc., and then, after withdrawing from Mii, misappropriating that relationship as well as Mii's intellectual property.  This court has supplemental jurisdiction over the counterclaim, <u>see</u> 28 U.S.C. § 1367(a), by virtue of its federal-question jurisdiction over Glenn's ERISA claim, <u>see</u> <u>id.</u> § 1331, and has elected to exercise that jurisdiction even after the federal claim was dismissed, based on the parties' expressed preference for this forum, <u>see</u> Order of March 22, 2010 (document no. 70).  Glenn has now moved for summary judgment, <u>see</u> Fed. R. Civ. P. 56, on all counts of Alan's counterclaim.

Glenn argues, among other things, that (1) he did not agree to assign his intellectual property rights to either Alan or Mii, (2) there is no evidence Mii owned any protectible trade secrets, (3) Glenn had no duties to Mii (or Alan), at least after withdrawing from Mii in February 2004, (4) though Glenn did business with Lovejoy after his withdrawal from Mii, that did not

---

required memorandum.  This argument ignores the disjunctive nature of the court's order to Alan:  he was to file the memorandum <u>or</u> join Mii as a counterclaimant.  In any event, Glenn's motion to dismiss the counterclaim is moot in light of this court's entry of summary judgment in his favor.

amount to tortious interference with its relationship with
Lovejoy, and (5) even if his withdrawal from Mii breached the
limited liability company agreement, it did not cause any harm.

As fully explained infra, the court agrees with Glenn that
he is entitled to summary judgment.  Although this case had been
pending for nearly three years before Alan filed his opposition
to Glenn's motion for summary judgment (not counting the time the
case was stayed), Alan has not developed any evidence to support
several propositions that are essential to his counterclaim.
First, there is no evidence of any agreement by Glenn to assign
his interest in any intellectual property to Mii or Alan, only to
another entity that is not a party to this case.  Second, Alan
has not properly identified, let alone come forward with evidence
tending to show, any trade secret allegedly misappropriated by
Glenn.  Third, Glenn's duties to Mii (or Alan) by virtue of his
management of or membership in Mii were limited to refraining
from gross negligence or willful misconduct, and Alan has not
come forward with evidence from which a rational factfinder could
conclude that Glenn's actions amounted to either.  Fourth, Alan
has not provided anything to dispute Glenn's submissions
establishing that, after he withdrew from Mii, he had no contact
with Lovejoy until after Mii had abandoned their relationship,
with the result that Glenn's contacts with Lovejoy are not

4

actionable.  Fifth, Alan has no evidence that Glenn's withdrawal from Mii, as such, caused any damages to the company or Alan.

As explained more fully below, the court grants Glenn's motion for summary judgment on the counterclaim, abstains from exercising jurisdiction over Glenn's remaining claim against Alan, and ends this episode of the parties' family feud.

## I.   Standard of review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A dispute is "genuine" if it could reasonably be resolved in either party's favor at trial.  See Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010).  A fact is "material" if it could sway the outcome under applicable law.  Id.

Where, as here, "the moving party avers an absence of evidence to support the non-moving party's case, the non-moving party must offer definite, competent evidence to rebut the motion." Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009).  In other words, the non-moving party "must proffer admissible evidence that could be accepted by a rational trier of fact as sufficient to establish the necessary proposition." Gomez-Gonzalez v. Rural Opportunities, Inc., 626 F.3d 654, 662

n.3 (1st Cir. 2010).  This means that "conclusory allegations, improbable inferences, or unsupported speculation" will not suffice to defeat a properly supported summary judgment motion. Meuser, 564 F.3d at 515 (quotation omitted).  In analyzing a summary judgment motion, the court must "view[] all facts and draw[] all reasonable inferences in the light most favorable to the non-moving party." Id.  The following facts are set forth in accordance with this standard.

## II. **Background**

## A. **Factual background**

### 1. **Mii's formation**

Alan and Glenn formed Mii, a limited liability company, in 1995.  They had "equal membership interests," at least until February 2004.  The most recent version of the limited liability company agreement, dated September 1997, reposited the right to manage the business of the company in the members, but allowed them to turn that right over to managers elected by the members. The parties agree that, at some point, Alan and Glenn became Mii's managers, that Alan has continued to serve in that capacity ever since, and that Glenn continued to serve in that capacity until his resignation in February 2004.

The membership agreement does not restrict a manager's ability to resign from that role (and specifically provides a procedure for replacing a manager who "ceases to be a Manager before his term expires for any reason").  The agreement does provide, however, that "[n]o member has power to withdraw by voluntary act from the Limited Liability Company."

As stated in the agreement, Mii's purpose was "to engage in the business of marketing and/or manufacturing of sensor materials, metallic powders and related parts."  Alan recalls that he and Glenn wanted, specifically, to finish the work on "composite materials and net shape pressing technologies" they had begun at another company they had started, Materials Innovation, Inc., formed in 1989.  By 2002, however, Materials "owed significant amounts of money to a number of creditors," so, Alan says, "it was decided that Materials would cease to operate as a going concern and that all of the resources of [Alan and Glenn] would be focused on" Mii.

Alan recalls that Glenn contributed "his creative talents and interests" to the Materials and Mii ventures, while Alan contributed some $23 million in capital.  Thus, Alan explains, Glenn received "co-equal" interests with Alan in those businesses "without the necessity of having to come up with any cash equity."  Neither Glenn nor Alan, though, ever served as an

7

employee of Mii; Glenn recalls that this arrangement was "by
design."  Glenn never entered into any employment contract with
Mii, including the "Invention, Non-Disclosure, and
Confidentiality Agreement" that Mii made its employees sign.

### 2.   Glenn's and Alan's agreements with Materials

In August 1996, Glenn and Alan entered into an agreement
assigning certain intellectual property to Materials.  In
relevant part, this agreement provided that "the Inventors"--a
term defined as Alan and Glenn "collectively"--"hereby assign,
grant and convey to [Materials] their entire right, title and
interest in and to U.S. Patent No. 5,453,293, together with . . .
any patent applications or patents claiming improvement in or
modification of the subject matter set forth in the Patent
developed by either or both of the Inventors."  Alan and Glenn
were listed as the inventors of the '293 patent, which issued in
September 1995.

The assignment agreement further provided that "[e]ach
modification and improvement related to Composite and Engineered
Materials"--a defined term--"covered by the patent now or
hereafter conceived, made or developed by Inventors, or which
shall become the property of Inventors in any manner whatsoever,
shall be deemed to be included in the terms of this Agreement."

8

But Mii was not a party to the assignment agreement.  Instead,
Mii had agreements to license various patents and patent
applications and other intellectual property (though not the '293
patent) from Materials.

In April 2001, Alan loaned Mii $1.5 million, receiving in
return a promissory note with a one-year term.  He loaned
$600,000 to Materials at the same time.  To provide collateral
for these loans, Mii (and Materials) subsequently provided Alan
(and his wife, Sara Beane) with a commercial security agreement,
dated January 18, 2002, granting them a security interest in,
among other things, "letters of patent, patent applications, and
other rights to intellectual property in which [Mii and
Materials] have ownership interests."  The agreement entitled the
lender to take possession of the collateral upon Mii's default.
Within two weeks of the execution of the security agreement, Mii
had defaulted on the note it had given Alan.

### 3.    Beginning of Mii's relationship with Lovejoy

In July 2002, Mii entered into a contract to sell a 1,000-
ton metal press to Lovejoy, an Illinois-based manufacturer of
metal parts.  In negotiating the contract, Lovejoy dealt with
both Glenn and Alan, who acknowledges that he participated "in
the portion of the negotiations related to the overall design of

the press." Lovejoy was the last customer to commit to buying a press from Mii before it eventually ceased operations.

Alan recounts that in fall 2003, one of Lovejoy's customers demanded more precise tolerances on its parts, so that "Mii felt the original approach of the system configuration," which already featured a "modified volumetric feed shoe," was not "adequate to the task." According to Alan, "Mii realized" that it had another "higher technology" which "might be" modified "to meet the specification[s]," but that approach was not without its challenges. Alan alleges that "Mii's email files show many conversations between Glenn" and Lovejoy about "the perceived necessity to upgrade the capabilities of the system," though Glenn did not make Alan or anyone else at Mii aware of these "negotiations" until 2004. While Alan says that "Lovejoy claims they walked away from these discussions believing that Glenn had committed Mii to accomplish an upgrade capable of meeting the [new] specifications," Alan also insists that "[t]here is no paperwork or documentation available to Mii that would substantiate such a contractual commitment."

Alan also accuses Glenn of mismanaging the Lovejoy project in other ways during his time at Mii. First, Alan recalls that, given the technological demands of building the press even to Lovejoy's original specifications, Glenn agreed "to institute a

10

detail design engineering relationship with a major Massachusetts mechanical engineering firm."  Nevertheless, Alan says, Glenn ultimately "circumvented" this arrangement "by essentially engaging [the firm's] assistance in mechanical drafting as opposed to engineering oversight."

Second, Alan accuses Glenn of a design error in "the clearances between the outer walls of the inner cylinder components and the inner walls of the outer cylinder components," so that "thermal expansion" caused them to touch, resulting in "catastrophic press failure."  Alan says that "cylinder design errors" necessitated a lengthy re-design and re-machining process that contributed to a "10-12 week" delay in delivering the press to Lovejoy.  Alan acknowledges, however, that another cause of the delay was an error by a third party who "improperly specified/designed the hydraulic fluid cooling system," and does not attempt to lay that error at Glenn's feet.  In any event, Alan recalls that the "total cost of the delay and rebuild was $600,000."  That figure, Alan explains, does not include a delay in Lovejoy's making both progress payments--which "destroy[ed] Mii's operational cash flows and ability to pay vendors"--and "follow on orders"--which Lovejoy had "ostensibly" committed to make "concurrently" with the delivery of the press.

11

By November 2003, Mii had delivered the press to Lovejoy, but the press was missing a "required fluidization component" that was still being manufactured.  It appears, though the record is unclear, that this component was the one Glenn allegedly caused Lovejoy to believe that Mii would deliver (even though, Alan says, this component was not included in the original specifications).  Lovejoy's principals, Michael Hennessy and Woody Haddix, attest that, through January 2004, Alan, Glenn, and others from Mii were working on the component, but without success, so that during that time the press did not "perform at the contractually-agreed upon levels and tolerances."[3]

### 4.   Mii's efforts at further financing

Beginning around January 2004, Alan and Glenn (together with their brother, David, who had worked for Mii as a consultant, and Sara, Alan's wife) engaged in a series of negotiations, Alan

---

[3]In the statement of facts in his objection to the summary judgment motion, Alan does not dispute this testimony.  He says in one of his declarations, however, that "the system fully met the contract specifications consistent with [] Hennessy's report to David Beane" (another brother of Alan and Glenn who was working for Mii as a consultant).  But Alan has not provided this report to the court (though he seems to have intended to do so).  In any event, for the reasons that will appear infra at Part III.C.2, whether or not the version of the press that Mii delivered to Lovejoy in November 2003 met the specifications in the contract is ultimately immaterial to the success of any of Alan's claims against Glenn here.

12

says, "to restructure Alan['s] and Sara's respective rights in the Mii companies and to get [Alan's] personal guaranty and [Mii's] approval" of a $500,000 loan to Mii from an outside lender, Fleet Bank.  Around the same time, Alan and Sara were working to resolve "property division issues relating to [her] suit for divorce."

At one point, Alan offered (among other things) to guarantee the loan personally in exchange for (among other things) Glenn's "assurance that all intellectual assets that have been or will be created by Glenn . . . and relate to [Mii's] business have been or will be assigned to Mii [] without additional consideration as has been consistent with prior practice."  Alan suggests that this assurance was necessary for him to provide certain representations (presumably as to Mii's right to the intellectual property it was using) that Fleet required to make the loan.

Alan recalls that "[b]ottom line, Glenn absolutely refused" to provide the assurance, so that Alan "decided he could not sign the Fleet [loan] documents" making the representations.  Alan, "[w]ith the benefit of hindsight," has come to see this as an effort by Glenn to induce Alan to "violat[e] Federal Banking Law and be subject to both criminal and civil sanctions."  In any event, Mii did not get the loan from Fleet--nor did Alan and Glenn reach agreement as to restructuring or refinancing Mii.

### 5.   Glenn's departure from Mii

On February 3, 2004, Alan notified Glenn via letter that Alan and Sara were "exercising [their] rights under [the] Commercial Security Agreement to sell, lease, transfer or otherwise deal with Collateral in accordance with the terms of [the] Agreement."  In the days before delivering this letter, Alan initiated discussions, and then a formal meeting, with Mii's employees about "trying to make it on the fly on our own without Glenn" because, Alan later explained, "at that point [he] had reason to believe Glenn may have 'walked away.'"  The consensus, apparently, was "to see what we could do to make the business viable by working together" without Glenn.

On February 4, 2004--the day after Alan's letter announcing his exercise of dominion over Mii's assets--Glenn gave Alan letters announcing that, effective immediately, Glenn was "resign[ing] from his position(s) and duties as an Officer[] and as a member of the Board of Directors of Materials . . . and Mii."  After dropping a company vehicle and customer files at Mii's facility within the next few days, Glenn had no further contact with the company until the onset of the various legal proceedings enumerated supra.

### 6.   **End of Mii's relationship with Lovejoy**

One of Lovejoy's principals, Haddix, says that, after repeated attempts to call Glenn at Mii's facility in early February 2004, he was told by a Mii employee that Glenn was no longer with the company.  Another of Lovejoy's principals, Hennessy, says that he eventually reached Alan, "who advised [Hennessy] that Glenn had left the company in all capacities and that Alan was going to continue operating Mii with its existing workforce and without Glenn."[4]  Glenn, for his part, says that upon his resignation from Mii he "ceased all contact with Lovejoy and did not even inform [it] that I had left."

Haddix and Hennessy recall that, over the next several weeks, they repeatedly expressed "concern that Glenn's departure would make it very difficult, if not impossible, for Mii to complete installation of the fluidization function" of the press, but Alan responded that "Mii had the experience and wherewithal to continue its business."  Haddix recalls a similar conversation

---

[4]Alan says that Haddix's account of his attempts to reach Glenn "cannot be true" but does not explain why or, for that matter, how he would have personal knowledge of that subject. Alan also claims that Hennessy's recollection that Alan said Glenn had left the company in all capacities "is not correct either."  Instead, Alan suggests that he said "it appeared Glenn had left the company with no present intent to return" but that Alan hoped "cool heads would prevail."  This dispute (if in fact it is one) is ultimately immaterial to the outcome of the motion.

at a subsequent meeting at Mii's facility, where "Alan insisted that Mii would be fine without Glenn and that the employees on board at the time were well versed in the capability and installation of the fluidization portion" of the press.

Alan does not dispute Lovejoy's account of this meeting, but he does suggest, as already mentioned, that Mii never agreed to provide a functioning fluidization system in the first place. Alan recalls that it was not until he spoke with Hennessy on or around February 10, 2004, that Alan "found out, to [his] complete surprise, that Mii had a very angry primary customer."  In fact, Alan says, aside from a "concept sketch" of the fluidization system, "no work was undertaken on Mii's part presumably because Mii believed the project was a time and materials addition to the contract and such had not been authorized by Lovejoy." Nevertheless, Alan says, Mii "intended for Lovejoy to be a satisfied customer," and agreed to work on the fluidization component of the press.

By March or April 2004, Mii employees had installed the fluidization component of the press at Lovejoy's facility, but, after working on it, "admitted that they were at wit's end and that they were not going to able to make the fluidization system function properly according to the specifications of the press." Alan later gave Haddix and Hennessy the same message.  Shortly

16

thereafter, personnel at Mii--including Alan--stopped returning
phone calls and emails from Haddix and Hennessy.  So they
"assumed that Mii had closed its doors" and "considered the
contract terminated by Alan's actions, and particularly, by his
admission that Mii could not make the press work, was not going
to continue trying, and lacked funding to do so."  Alan has not
come forward with any evidence disputing Lovejoy's account of
Mii's admissions of defeat or its failure to return Lovejoy's
calls or emails beginning in the spring of 2004.[5]  Nor does Alan
dispute the testimony of Haddix and Hennessy that "[i]t was not
until after Mii and Alan had failed to meet their obligations
that [Lovejoy] contacted Glenn and asked him to help."

_____

[5]In the statement of disputed facts in his summary judgment
objection, Alan purports to dispute the account insofar as it
"implies that Mii could not resolve [the] Lovejoy problems," but
does not point to any evidence supporting the contrary inference.
Alan does state in one of his declarations that "Mii and its
staff solved the problem in 6-8 weeks" after Glenn had left, and
that, at the time Lovejoy terminated the contract, "Mii had
delivered both a major software upgrade as well as equipment
upgrade that likely established a baseline solution when
implemented and tested."  But that is not the same as saying that
the fluidization system actually worked and, moreover, Alan does
not deny, in either of his declarations, that he told Lovejoy
that "Mii was not going to be able to make the fluidization
system function properly."  So, again, even if there were some
genuine factual dispute over whether Mii performed its contract
with Lovejoy, that dispute would be immaterial to the outcome
here.  See also note 3, supra.

### 7.   Glenn's alleged competition with Mii

Alan alleges that, by November 2004, Glenn "was pursuing active negotiations with Lovejoy for the immediate fabrication of two additional 1000-ton systems identical to that delivered to Lovejoy by Mii, and for a new 300-ton system."  Alan also alleges that, in March 2004, Glenn--acting on behalf of a new limited liability company he had formed, Glenn Beane LLC--contacted several other of Mii's customers, or potential customers.

Glenn, for his part, says that he did not form Glenn Beane, LLC, or "even explore or consider the process of forming it," until after he had resigned from Mii (documents on file with the New Hampshire Secretary of State give the company's "entity creation date" as February 10, 2004, i.e., a week or so after Glenn's resignation).  Alan has not come forward with any evidence tending to show that--at any time before Glenn resigned from Mii--Glenn formed, or made plans to form, Glenn Beane LLC, or that he had any contact with any of Mii's customers or potential customers on behalf of himself or Glenn Beane LLC.

On December 15, 2004, acting as attorney-in-fact for Materials, Glenn executed a document assigning a number of patents, including the '293 patent, from Materials to Alan and Glenn, then recorded that document with the United States Patent and Trademark Office.  This "re-assignment" invoked a provision

18

of the assignment agreement that, "[u]pon [its] termination for
any cause, [Materials] agrees to immediately reassign to the
Inventors all patent rights assigned" thereunder, together with
"any and all right to any improvements or modifications which
[Materials] shall have made during the life of this Agreement
which relate to Composite and Engineering Materials" (a defined
term).  The provision further gave "the Inventors power of
attorney to execute and file assignments with the [USPTO] . . .
to change record title."  Glenn points out that the assignment
agreement gave "either Inventor . . . the right to terminate [it]
effective immediately upon written notice to [Materials] in the
event that" Materials was dissolved, including by an
administrative or judicial order remaining in effect for 45 days.

In November 2003, Materials had been administratively
dissolved by order of the New Hampshire Secretary of State, and
nothing was (or has been) done to lift that order.  See N.H. Rev.
Stat. Ann. §§ 293-A:14.20--14.22.  Mii has likewise been
administratively dissolved, see id. § 304-C:52, by an order of
the Secretary of State issued in August 2007, but, Alan says, "is
engaged in the process of winding up its affairs," see id.
§§ 304-C:52, II, 304-C:56.

**B.    Litigation history**

**1.    Prior action in this court**

In October 2006, Alan filed for bankruptcy in the United States Bankruptcy Court for the Middle District of Florida.  In re Beane, No. 06-5723 (M.D. Fla. Oct. 19, 2006).  Alan soon sought, and received, permission from the Bankruptcy Court to employ counsel to conduct litigation against Glenn.  In November 2006, Alan and Mii commenced an action against Glenn and Glenn Beane LLC in this court, bringing many of the same claims that Alan later brought as a counterclaimant in this action.  Beane v. Beane, No. 06-446 (D.N.H. Nov. 30, 2006).  Glenn counterclaimed, bringing essentially the same claims he later brought as a plaintiff in this action.[6]

After furious motion practice--which included Glenn's filing five separate motions to dismiss, and the Magistrate Judge's imposing monetary sanctions against both Alan and Glenn at different points--the court (McAuliffe, C.J.) ordered Alan and Mii to show cause why it should not dismiss their sole claim under federal law and decline to exercise supplemental jurisdiction over the rest of the case.  In response, Alan argued, among other things, that diversity jurisdiction existed,

---

[6]Glenn later filed a proof of claim in Alan's bankruptcy action, also making essentially the same claims.

because Mii was a nominal party whose citizenship should not be counted.  But Judge McAuliffe disagreed, ruling that "[t]he rights upon which plaintiffs base their claims are Mii's rights, and the remedies sought would directly benefit Mii" and, furthermore, that Mii was an indispensible party under Rule 19(b).  Beane v. Beane, 2008 DNH 082, 15-20.  The court also ruled that the amended complaint failed to state any claim under federal law.  Id. at 8-12.  So the court dismissed the action for lack of subject-matter jurisdiction, id. at 21, entering judgment to that effect on April 30, 2008.

### 2.   This action

### a.   Claims and counterclaims

On June 11, 2008, Glenn brought this action against Alan. Around the same time, Glenn also commenced an action, consisting of many of the same claims, against Mii and other parties in Grafton County Superior Court.  Beane v. Mii Techs., LLC, No. 2008-C-079 (N.H. Super. Ct. June 10, 2008).  Glenn's amended complaint in this action is in five counts:

> • equitable relief under the Employee Retirement Income Security Act ("ERISA"), specifically, 29 U.S.C. § 1132(a)(3)(B)(ii), to enforce certain administrative obligations under an employee benefit plan created by Mii and Materials (count 1);

• a declaratory judgment that Glenn's membership in Mii ceased as of February 4, 2004, and other declarations as to Mii's status after that date (count 2);

• as an alternative to count 2, the judicial dissolution of Mii (count 3);

• also as an alternative to count 2, an accounting from Mii (count 4); and

• voiding an allegedly fraudulent transfer from Mii to Alan (count 5).

Alan originally moved to dismiss this action, based on the pendency of similar litigation in other courts, but withdrew the motion around the same time that he filed an answer and a counterclaim against Glenn.

Alan subsequently amended his counterclaim three times, the first as of right and the next two times with leave of court. The counterclaim, as amended, is in 21 separate counts:

• breach of contract in that Glenn refused to transfer to Mii "all of his intellectual property pertaining to the presses" (count 1);

• breach of implied covenants of good faith and fair dealing by Glenn's "using [that] intellectual property for his own benefit" (count 2);

• breach of "fiduciary duties" that Glenn owed Alan through "actions that resulted in disputes between Mii and Lovejoy" (count 3);

• breach of a "fiduciary duty of loyalty," i.e., "a series of fiduciary or quasi-fiduciary duties" that Glenn owed Alan, by "expropriat[ing] the business opportunities of Mii," including the Lovejoy relationship (count 4);

• breach of a "fiduciary duty of care, diligence, full disclosure and advice" that Glenn owed Alan, by mismanaging Mii's relationship with Lovejoy (count 5);

• breach of a "confidential relationship" by using the "confidential information of Mii to misappropriate the business of Mii" (count 6);

• through that same conduct, misappropriation of trade secrets (count 7);

• tortious interference with contractual relations, i.e., Mii's relationship with Lovejoy (count 8);

• tortious interference with prospective contractual relations, i.e., Mii's relationships with other prospective customers (count 9);

• a claim for "ownership of intellectual property rights," asserting that "[a]ll inventions conceived of by Glenn [] are subject to an obligation to assign such rights to Mii," and requesting equitable and declaratory relief as well as damages (count 10);

• unjust enrichment, in that Glenn "wrongfully misappropriated the press technology" (count 11);

• violations of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A, through, among other things, Glenn's "representation that he is the source of the press technology and that he owns the [underlying] intellectual property," which amounts to "a false designation of origin" (count 12);

• a second claim for interference with prospective contractual relations, this one based on Alan's relationship with unidentified "buyers," by "forcing Mii out of business" and then claiming to own the intellectual property (count 13);

• "conspiracy, [and] aiding and abetting," in that Glenn conspired with Glenn Beane LLC "to take the intellectual property developed, commercialized and patented by Mii" (count 14);

• "wrongful dissociation," in that Glenn withdrew from Mii in violation of the prohibition on voluntary withdrawal in the limited liability company agreement (count 15);

• "constructive trust and specific performance," seeking to impose a constructive trust on intellectual property "developed, improved or enhanced" since Glenn's dissociation from Mii, and to direct Glenn to transfer intellectual property to Mii (count 16);

• a claim for specific performance of Glenn's alleged agreement with third parties to sign and file "ERISA Reports"--which Alan now agrees is moot now that, he says, Glenn has done those things (count 17);

• another claim for Glenn's violation of § 358-A, this time by bringing the ERISA claim against Alan in this lawsuit (count 18);

• a "statutory claim for attorneys' fees, costs, and expenses" incurred by Alan in responding to the ERISA claim (count 19);

• a common-law claim for the same (count 20); and

• a claim for a declaratory judgment--which Alan agrees is now moot as a result of this court's ruling on Glenn's motion to substitute, see Beane v. Beane, 2011 DNH 12 (count 21).

While Glenn objected to Alan's second proposed amendment (and was overruled), he did not object to the third proposed amendment, which added counts 17-21.  So this court ruled that, "although some of [those] claims . . . appear to be legally improper or baseless," the amendment would be allowed because "Glenn has not bothered to object."  Order of Aug. 3, 2009 (document no. 59).

b.   **The stay and its lifting**

In that same order, the court also denied the parties'
pending cross-motions for partial summary judgment, and stayed
the case, in light of the litigation Glenn had filed against Mii
in the Superior Court, which had already conducted a bench trial
on his claims (essentially the same claims as here).  See id.
Eventually, the Superior Court found in favor of Mii on all of
Glenn's claims in that action.  See Beane v. Mii Techs., LLC, No.
2008-079 (N.H. Super. Ct. July 9, 2009).[7]  Alan then moved to
lift the stay of this action to allow him to move for partial
summary judgment, including on Glenn's ERISA claim, while Glenn
moved for voluntary dismissal of that claim, arguing that he had
obtained the "principal relief" he sought through other means.
Alan objected that the dismissal of the ERISA claim would deprive
this court of subject-matter jurisdiction.

In response, this court ordered a status conference at which
the parties were to address, among other issues, whether this
court had diversity jurisdiction over Glenn's remaining claims.
Order of Mar. 5, 2010 (document no. 69).  The court observed

---

[7]Glenn appealed this order--but only insofar as it dismissed
his fraudulent transfer claim with prejudice, arguing that it
should have been dismissed without prejudice when he moved for a
voluntary non-suit on it.  The New Hampshire Supreme Court agreed
in an unpublished order vacating the dismissal with prejudice.
Beane v. Mii Techs., LLC, No. 2009-562 (N.H. 2011).

that, if Mii were an indispensable party-defendant to Glenn's
claim for a declaration that his membership in it had ceased as
of February 2004, that might destroy diversity, given Alan's
position that Glenn--a New Hampshire citizen--still remained a
member (because, under the rule that a limited liability company
has the citizenship of each of its members, this would put a New
Hampshire citizen on both sides of the case).  Id. at 2-4.

At the ensuing conference, however, Alan, through counsel,
offered to admit that Glenn's membership in Mii did indeed cease
as of February 4, 2004, as Glenn alleged in support of count 2 of
his amended complaint.  This court proceeded to issue an order
entering judgment, by agreement, for Glenn on count 2 insofar as
it sought a declaration that his membership in Mii had ceased as
of that date.[8]  Order of Mar. 22, 2010 (document no. 70) at 4.
The court ruled that, as a result, the balance of the relief
Glenn sought in count 2, as well as in counts 3 and 4, was moot,
and dismissed those claims accordingly.  Id. at 4-5.  The court
also dismissed Glenn's ERISA claim, count 1, "as moot in part and
otherwise unripe," based on Glenn's statements in his motion for
voluntary dismissal and at the conference.  Id. at 3.

_____

[8]Despite this clear ruling, Alan incorrectly states in
several places in his filings in opposition to the summary
judgment motion that "all of Glenn's claims have been dismissed."

Finally, the court ruled that while Mii was not an indispensible party to count 2 of Glenn's complaint, "most if not all of the counterclaims asserted by Alan actually belong to Mii, as this court has previously ruled." Id. at 2-3 (citing Beane, 2008 DNH 082, 14-16).  So the court ordered that Mii be joined as a plaintiff-in-counterclaim (which would not affect this court's subject-matter jurisdiction, since it could exercise supplemental jurisdiction over the counterclaims without regard to Mii's citizenship).  Id.  Finally, the court lifted the stay, noting that the Superior Court's decision ended up having "limited, if any" preclusive effect on the claims in this action.  Id. at 1. Eventually, Glenn filed his instant motion for summary judgment.

III. **Analysis**

As summarized at the outset, Glenn makes a number of arguments in support of his motion for summary judgment, including that:  (A) the '293 patent was never assigned to Mii, only to Materials, which is not a party here, and there is no evidence of any agreement between Glenn and either Mii or Alan for the ownership of any intellectual property; (B) there is no evidence of any protectible trade secrets belonging to Alan or Mii; (C) there is no evidence that Glenn breached any of his duties to Mii (or to Alan) before he resigned, and, insofar as

27

any such duty continued after he resigned, he did not violate it in his dealings with Lovejoy, which did not start up again until after Mii had abandoned the relationship; (D) even if Glenn's withdrawal from Mii breached the limited liability company agreement, it did not cause any harm, and (E) Alan has no claim arising out of Glenn's seeking ERISA relief.[9]  As explained below, these arguments are correct, and entitle Glenn to summary judgment on all counts of Alan's amended counterclaim.

## A.   Ownership of patents or other intellectual property

One of Alan's principal complaints against Glenn is that he has refused to transfer certain "Intellectual Property"--defined in the amended counterclaim as "intellectual property pertaining to the manufacture of presses employing high pressure, net shape forming technology"--which rightfully belonged to Mii and, after leaving Mii, used that intellectual property for his own benefit.

---

[9]Glenn also argues that a number of Alan's claims are barred by New Hampshire's three-year statute of limitations, see N.H. Rev. Stat. Ann. § 508:4, I, because they arise out of events that occurred in 2004 (or earlier) and this action was not commenced until 2008.  But Alan argues that, because he and Mii brought essentially the same claims in his prior action against Glenn in this court--which was itself timely--and that action was dismissed for lack of subject-matter jurisdiction less than one year before this one was commenced, his claims here are timely under New Hampshire's "savings statute," N.H. Rev. Stat. Ann. § 508:10.  Because Glenn is entitled to summary judgment on other grounds, the court need not reach this argument.

This charge is essential to Alan's claims for breach of contract
(count 1) and breach of the implied covenant of good faith and
fair dealing (count 2), and, as explained <u>infra</u>, also important
to his claims for "ownership of intellectual property rights"
(count 10), unjust enrichment (count 11), conspiracy (count 14),
"constructive trust and specific performance" (count 16), one of
his claims for violation of § 358-A (count 12), and one of his
claims for tortious interference with prospective contractual
relations (count 13).  A problem with all of these claims, as
Glenn points out, is that there is no evidence that he agreed to
assign intellectual property to Mii or to Alan--only to
Materials, which is not a party here.

       A further problem with these claims is that Alan was a co-
inventor of the '293 patent, which, according to him, was the
source of "[a]ll subsequent intellectual property" at issue here.
<u>See</u> Part II.A.2, <u>supra</u>.  By virtue of his co-inventorship, Alan
became a co-owner of the patent, <u>see</u>, <u>e.g.</u>, <u>Ethicon, Inc. v. U.S.
Surgical Corp.,</u> 135 F.3d 1456, 1465 (Fed. Cir. 1998), and was
entitled to use that patent without Glenn's consent or, indeed,
without even accounting to him for any resulting profits.  <u>See</u> 35
U.S.C. § 262.  In light of this, it is difficult to understand
Alan's repeated complaint that Glenn's refusal to transfer the
'293 patent and resulting technology to Mii was somehow

unreasonable or unfair in light of the substantial capital
investment that Alan says he made in developing that intellectual
property (some $23 million, by his count).  Despite his
assertions to the contrary, Alan was never deprived of the
benefit of that investment:  he was always free to do what he
wished with the '293 patent, such as selling it or licensing it
to Mii so that it could use it in its dealings with Lovejoy, as
collateral for the loan from Fleet, or for any other reason.[10]

The very premise of Alan's numerous claims against Glenn
arising out of the ownership of the '293 patent and related
intellectual property, then, is mistaken.  Indeed, Alan admits in
a footnote to his memorandum opposing summary judgment that "he
was obviously unaware that he was an [i]nventor of the
intellectual property," presumably until Glenn brought it to his
attention in his summary judgment submissions here.  It would
ordinarily border on shocking for a person to engage in knock-
down, drag-out litigation claiming deprivation of a right that he
possessed all along--and would have realized he possessed all

---

[10]It is true that Alan had assigned his interest in the '293
patent to Materials in the assignment agreement, but--just like
Glenn purported to do--Alan could have terminated that agreement
after Materials was dissolved in 2003 (which was before Mii's
attempt to get the loan from Fleet, and before Glenn left) or,
even more simply, caused Materials (which Alan says he has always
controlled) to release him from the agreement.

along, if only he had bothered to check.  It is less shocking
here, however, because this is not so much a lawsuit to resolve
an honest dispute over rights as it is a grudge match.  <u>See</u> note
1 and accompanying text, <u>supra</u>.  In any event, as explained fully
<u>infra</u>, Glenn is entitled to summary judgment on all of Alan's
claims arising out of ownership of intellectual property.

### 1.   Contract claims based on ownership

### a.   No ownership agreement between Glenn and Mii

As an initial matter, there is no evidence of any contract
through which Glenn agreed to assign any intellectual property to
Mii.  In arguing to the contrary, Alan relies heavily on his and
Glenn's agreement assigning the '293 patent and defined
"modifications and improvements" to Materials.  <u>See</u> Part II.A.2,
<u>supra</u>.  But that was an agreement to assign intellectual property
rights to <u>Materials</u>, not to Mii.  Materials has never been a
party here, and Alan does not explain how the agreement conveyed
any rights in the '293 patent, or any other intellectual
property, to <u>Mii</u> (which did not even have a license from
Materials for the '293 patent, <u>see</u> <u>id.</u>).[11]

----

[11]While Alan suggests in his sur-reply that, because
Materials has been dissolved, he can enforce its rights "as the
equitable owner of its property," he does not explain what he
means by "equitable owner."  New Hampshire law is clear that the
dissolution of a corporation does not transfer title of its

Instead, Alan argues that he personally acceded to
Materials's rights under the assignment agreement by virtue of
his security agreement with Materials, which defaulted on the
underlying loan.  See id.  A security interest in the
intellectual property conveyed by the assignment, though, is not
tantamount to ownership of the intellectual property conveyed by
the assignment.  To the contrary, to obtain ownership of the
rights of Materials under the assignment, Alan would have needed
to purchase those rights through a "commercially reasonable
disposition."  N.H. Rev. Stat. Ann. §§ 382-A:9-610(a)-(c) (New
Hampshire's version of Article 9 of the Uniform Commercial Code,
governing secured transactions); cf. Sky Techs. LLC v. SAP AG,
576 F.3d 1374, 1380-81 (Fed. Cir. 2009) (ruling that ownership of
patents serving as collateral under a security agreement passed
to the creditor, but only after it disposed of the patents at a
public auction at which it purchased them).  Alan does not claim
to have done so, and there is no record evidence to that effect.

---

property to its shareholders or anyone else.  See N.H. Rev. Stat.
Ann. § 293-A:14.05(c)(1).  At most, then, Alan might have caused
Materials to bring suit against Glenn for breach of the
assignment agreement.  But (1) Alan has never sought to add
Materials as a party here, and it is too late to do so now, see,
e.g., Cabrera v. Municip. of Bayamon, 622 F.2d 4, 6 (1st Cir.
1980), and (2) any claim by Materials would be barred by the
statute of limitations, because Materials was not a party to the
prior lawsuit in this court either and therefore cannot avail
itself of the savings statute, see note 9, supra.

His security agreement with Materials, then, does not allow him to enforce its assignment agreement with Glenn.

Alan also suggests that Glenn breached the assignment agreement by "reassigning" the '293 patent to himself and Alan in December 2004.  See Part II.A.7, supra.  But the agreement expressly provides for Materials to "immediately reassign to the Inventors all patent rights assigned to [it] by the Inventors under this Agreement" upon "termination of this Agreement for any cause"--and one of the causes for termination expressly set forth in the agreement is the dissolution of Materials, which occurred in 2003.  See id.

Nevertheless, Alan argues, the agreement was never terminated, because termination can occur only upon written notice to Materials, which Glenn never provided.  Even if this is correct, though, the court cannot see how it supports any claim by Alan (or Mii) that Glenn breached an agreement with him (or Mii) to assign the '293 patent and related intellectual property. At most, it would support a claim by Materials that it still held the assignment under the agreement because Glenn had not properly terminated it.  Again, however, Materials is not a party here,

and Alan has not articulated any theory empowering him (or Mii) to enforce whatever rights Materials has.[12]

Alan also points to statements in his amended counterclaim and declarations filed in opposition to the summary judgment motion, as well as a letter from Mii's former attorney, that "create a genuine issue of fact regarding the intentions of Alan and Glenn with respect to the ownership of the intellectual property and technology" in question.  If Alan means that the statements and the letter create a genuine issue as to the existence of an agreement for the ownership of the intellectual property (which, as distinguished from the parties' "intentions," is the material issue here), the court disagrees.

Most of Alan's statements simply outline his chief complaint, noted supra, that he contributed the money that Materials and Mii used to fund their operations, while Glenn

_____

[12]The same reasoning applies to Alan's complaint that Glenn wrongfully filed the assignment with the USPTO because the assignment agreement vested power of attorney to do so in "the Inventors"--plural, rather than singular, which Alan takes to mean that the power had to be exercised jointly.  (This interpretation is questionable:  the agreement specifically provides that "[a]ny noun or pronoun shall be deemed to include both the singular and the plural.")  Since Glenn used the power of attorney merely to record the reassignment, rather than to effect it--as he points out, that occurred automatically upon termination of the agreement for cause--it is hard to see how the recording has anything to do with Glenn's ownership of the intellectual property vis-a-vis Materials, let alone Alan or Mii.

"made no personal financial contribution to either" and, in fact, "was paid for his services primarily from funds loaned and invested" by Alan.  But Alan does not say, or point to any other evidence suggesting, that Glenn <u>agreed</u> that the result of this arrangement would be Mii's (or Alan's) ownership of any intellectual property conceived or developed by Glenn.[13]  That may have been what Alan expected as a result of his financial contribution, but "subjective expectations are insufficient to create an implied contract" under New Hampshire law.  Durgin v. Pillsbury Lake Water Dist., 153 N.H. 818, 821 (2006) (quotation marks omitted).  Moreover, as already discussed, Alan always had an ownership interest in the '293 patent--which he characterizes as the source of all of the intellectual property developed at Mii--so his expectation was not disappointed, in any event.

As for the letter from the attorney, it states merely that he had been retained by Alan "for the purpose of inventorying, evaluating, and continuing the prosecution and maintenance of the intellectual property developed by" Mii and asks for Glenn, on behalf of Mii, to consent to this representation since the attorney "had prepared a patent application for Mii in 2001."

---

[13]Alan states that Glenn "agreed to contribute his . . . interests in the basic joint patents" to Mii, but a party cannot defeat summary judgment with these sorts of "conclusory allegations," as already noted.  Meuser, 564 F.3d at 515.

The court is at a loss to see how this even tends to show what
Alan says it "proves," i.e., "that [the attorney] believed that
the intellectual property and technology . . . belonged to Mii."
Regardless, an attorney's "belief" as to his client's rights is
not evidence that the client actually has those rights (though
attorneys no doubt wish that were so).  Neither the letter, nor
any other record evidence identified by Alan, creates a genuine
issue of fact as to the existence of an agreement between Glenn
and Mii as to the ownership of the '293 patent or any other
intellectual property rights.

### b.   No ownership agreement between Glenn and Alan

Seizing on his recently discovered co-inventorship of the
'293 patent, Alan argues in his summary judgment filings that he
and Glenn agreed that they would be "tenants in common" as to the
patent, and all of the resulting intellectual property,
obligating them to share in any profits realized from using that
intellectual property.  Alan asserts that this--a "tenancy in
common," rather than a "joint tenancy"--is the "agreement to the
contrary" contemplated by 35 U.S.C. § 262, which provides that,
in the absence of such an agreement, "each of the joint owners of
a patent may make, use, offer to sell, or sell the patented
invention . . . without the consent of and without accounting to

36

the other owners."  Needless to say, this theory marks a dramatic
shift from the position Alan took in his amended counterclaim
(and, so far as the court can tell, throughout the entirety of
both this litigation and the parties' prior lawsuit here).  And
that is not the only problem with it.

But it is a problem, and a fatal one at that.  The "tenancy
in common" theory is not even hinted at in Alan's counterclaim
(which has been amended three times) and, indeed, is inconsistent
with the claims to ownership of intellectual property set forth
there--all of which rest on the premise that Glenn agreed to
assign his intellectual property to Mii, without mentioning any
agreement on that subject with Alan, or even acknowledging that
Glenn had any rights in the intellectual property at all.  Even
Alan's opening memorandum in opposition to summary judgment does
not claim an agreement for a "tenancy in common" but suggests
that such a tenancy arose by operation of law due to the joint
inventorship of the '293 patent by Glenn and Alan.  It was not
until Glenn pointed out in his reply that this arrangement would
not have prevented Glenn from using the patent or required him to
share in the profits of doing so, per 35 U.S.C. § 262, that Alan
argued, in his sur-reply, that he and Glenn had agreed otherwise.

A plaintiff ordinarily may not raise a theory of relief for
the first time in his opposition to the defendant's motion for

summary judgment, see, e.g., Kunelius v. Town of Stow, 588 F.3d
1, 19 (1st Cir. 2009), let alone his sur-reply.  While the court
could nevertheless treat the objection as a motion to amend, see
id., Alan is plainly not deserving of that relief here.  He has
already amended his counterclaim three times since it was first
filed, more than three years ago.  More to the point, Alan has
completely changed his characterization of the claimed agreements
for ownership of the intellectual property in the time between
his last amended counterclaim (where he said Glenn had agreed to
assign it to Mii) and his summary judgment sur-reply (where he
now says Glenn agreed that he would hold it as a tenant-in-common
with Alan).  For this reason alone, Alan cannot avoid summary
judgment based on his theory that he and Glenn agreed to hold the
'293 patent or other intellectual property as tenants-in-common.
Indeed, given its substantial deviation from the account of the
parties' agreement set forth in his prior declarations, Alan's
declaration supporting the claimed tenancy in common agreement
(submitted with his sur-reply) appears to be a "sham affidavit"
interposed solely to avoid summary judgment.  See, e.g., Abreu-
Guzman v. Ford, 241 F.3d 69, 74 (1st Cir. 2001).

Those problems aside, the statements in the declaration do
not create a genuine issue of fact as to the existence of such an
agreement, or its breach.  These statements either attest solely

to the parties' expectations or intentions of a joint tenancy for
the intellectual property (i.e., without explicating how they
reached agreement on that point) or assert in a conclusory
fashion that such an agreement existed.[14]   Like the statements
that Alan offers as "evidence" of Glenn's agreement to assign his
intellectual property rights to Mii, then, these statements do
not create a genuine issue of material fact as to the existence
of the claimed joint tenancy agreement.

Furthermore, even if they did, there is no evidence tending
to show that Glenn breached any such agreement.   Alan has not
pointed to any evidence suggesting that, in Glenn's dealings with
Lovejoy or otherwise, he made use of the intellectual property
covered by the alleged "tenancy-in-common" arrangement.   Instead,
Alan argues that "[s]ince Glenn did not testify in his affidavit
[accompanying his summary judgment motion] that he derived no

---

[14]These statements are worth quoting directly:   "[a]t no
time was our relative interest in the technology we created . . .
be [sic] several interests.   Glenn, in particular, never wanted
severability [sic] of interests because he did not want to ever
be the victim of what he did to me"; "Glenn and I owned a co-
tenancy in common interest in all of the patents, intellectual
property and technology and other technology"; "I acquired,
owned, and intended to acquire and own a 50% interest in all of
the patents and intellectual property and technology developed
with my money and all of the profits derived from those patents
and intellectual property and technology, not an interest that
could be taken by my brother for his own benefit"; and "Glenn and
I agreed that we would each have a 50% tenancy in common interest
for the patents and share the profits derived from the property."

profit or benefit from the patent and related intellectual
property, this court must infer that he did."

While that sort of logic has some historical pedigree (the
Star Chamber's practice of finding defendants guilty because they
refused to deny the charges against them comes to mind, see,
e.g., VII John Henry Wigmore, Evidence § 2250, at 281-83 (John T.
McNaughton, ed., rev. ed. 1961)), it has not taken hold in
federal court.  Rather, "[a]s to issues on which the summary
judgment target bears the ultimate burden of proof, she cannot
rely on an absence of competent evidence, but must affirmatively
point to specific facts that demonstrate the existence of an
authentic dispute." McCarthy v. Nw. Airlines, Inc., 56 F.3d 313,
315 (1st Cir. 1995); accord II Wigmore, supra, § 290, at 219-20.
So Alan, who bears the burden of proof on his claim for breach of
contract--including his new theory that Glenn, without accounting
to Alan, used the technology covered by the alleged joint tenancy
agreement to do work for Lovejoy--cannot avoid summary judgment
on that theory by arguing that Glenn has failed to disprove it.

In short, Alan has failed to raise (i) a genuine issue of
fact as to the existence of an agreement for Glenn to assign the
'293 patent or any other intellectual property to Mii, (ii) any
legitimate theory that would enable Alan (or Mii) to enforce
Glenn's assignment agreement with Materials, or (iii) a genuine

issue of fact as to the existence or breach of an agreement for joint tenancy of the '293 patent, even if that claim were properly presented.  Accordingly, Glenn is entitled to summary judgment on Alan's claim for breach of contract (count 1), as well as his claim for breach of the covenant of good faith and fair dealing (count 2), because--contrary to what Alan seems to suggest in his counterclaim--the covenant does not exist independently of a contract, see J&M Lumber & Constr. Co., Inc. v. Smyjunas, 161 N.H. 714, 724 (2011).

### 2.   Other claims based on ownership

As noted at the outset, Alan also makes a number of other claims based on his (or Mii's) claimed ownership of intellectual property, including claims for relief based on "ownership of intellectual property rights" (count 10), unjust enrichment (count 11), conspiracy (count 14), violation of § 358-A (count 12), tortious interference with prospective contractual relations (count 13), and "constructive trust and specific performance" (count 16).  For the most part, these claims depend on an agreement by Glenn to assign intellectual property to Mii or to Alan and, as just discussed at length, Alan has failed to show a genuine issue as to the existence of such an agreement.  Insofar as Alan could prevail on any of these claims without proving such

41

an agreement, they nonetheless have other deficiencies that entitle Glenn to summary judgment.

### a.   Ownership of intellectual property

As set forth in the amended counterclaim, Alan's claim for "ownership of intellectual property" (count 10) asserts Glenn's "contractual and equitable obligations to assign rights to inventions invented during the course of his performance of work for Mii to Mii."  Again, Alan has not pointed to any evidence of a contract to that effect between Glenn and Mii, and neither Alan nor Mii can enforce Glenn's contract to that effect with Materials.  <u>See</u> Part III.A.1.a, <u>supra</u>.  While Alan, in his memorandum opposing summary judgment, also refers to license agreements between Mii and Materials, <u>Glenn</u> was not a party to those agreements, so they likewise did not obligate him to transfer any intellectual property to Mii or to Alan.[15]

Alan's claim that Glenn had "equitable obligations" to that effect seems to refer again to Alan's complaint that he made all of the capital investment in Mii, while Glenn made none.  As already discussed, though, Alan has not pointed to anything

---

[15]Alan also refers to Mii's limited liability company agreement.  While Glenn was a party to that agreement, it makes no provision for ownership of any intellectual property, and Alan does not argue to the contrary.

beyond his subjective expectation to suggest an agreement or understanding that, as a result, he would personally own any intellectual property developed by Glenn during Mii's existence (and, in line with that expectation, Alan has always been a co-owner of the '293 patent--which he identifies as the source of "[a]ll subsequent intellectual property"). See Part III.A.1, supra. Nor has Alan identified any agreement between Glenn and Mii that the company would own the intellectual property he developed during his work on its behalf.

As Glenn also points out, Alan has likewise not identified the particular intellectual property that he (or Mii) claims to own, let alone come forward with any evidence that Glenn in fact even created any particular intellectual property in that capacity. Thus, even if Mii (or Alan) had some equitable claim to intellectual property Glenn created while working for Mii--a point this court need not and does not decide--Alan has not provided the necessary evidentiary support for that claim, i.e., that Glenn actually created particular intellectual property while working for Mii.[16]  This evidentiary gap, moreover, makes

---

[16]This is more than a technicality, in light of the fact that, as reflected by the Materials-Mii license agreement, much of the intellectual property used by Mii was created by Glenn and others while they were working for Materials.  Insofar as this arrangement reposited ownership of that intellectual property in any person besides its inventors, then, that person would have

Alan's insistence that Glenn was Mii's employee, as opposed to an independent contractor, immaterial.

This is fatal to Alan's claim to "ownership of intellectual property" insofar as it is based on Glenn's alleged "equitable obligations to assign rights to inventions invented during the course of his performance of work for Mii to Mii." Because, again, Alan has also failed to come forward with evidence that Glenn had any contractual obligation to that effect, Glenn is entitled to summary judgment on this claim (count 10).

### b. Unjust enrichment and constructive trust

For essentially the same reasons, Glenn is also entitled to summary judgment on Alan's claims for unjust enrichment (count 11) and constructive trust and specific performance (count 16), insofar as that relief is directed at intellectual property. "Unjust enrichment is an equitable remedy, found where an individual receives a benefit that it would be unconscionable for him to retain." Clapp v. Goffstown Sch. Dist., 159 N.H. 206, 210

---

been Materials, not Mii or Alan--and, again, Alan has not advanced any legitimate theory that would enable him (or Mii) to enforce rights that belonged to Materials. See Part III.A.1.a, supra. Furthermore, Mii's license agreement with Materials provided that any improvements on the technology covered by the license belonged to Materials, not to Mii, so (by Alan's own account of the development of the technology at issue here) any right to inventions by Glenn during his work for Mii would seem to belong to Materials.

(2009).  Alan's unjust enrichment claim sounds the familiar
refrain that he "invested substantial time, labor and money in
the creation and production of the press technology," but was
deprived of the benefit of that investment when Glenn
"misappropriated the press technology."

As just discussed, though, Alan has not identified--let
alone provided any evidence of--any intellectual property that
Glenn developed during his time at Mii so that his retention of
it would be "unconscionable" in light of Alan's investment in the
company.  Furthermore, as also already discussed, Alan has not
come forward with evidence that Glenn has used any of the
intellectual property developed through his ventures with Alan,
whether in Glenn's dealings with Lovejoy or otherwise.  See Part
III.A.1.b, supra.  These shortcomings are fatal to Alan's unjust
enrichment theory, which requires a genuine issue as to whether
Glenn received some benefit at Alan's expense.  See, e.g., Cohen
v. Frank Developers, Inc., 118 N.H. 512, 518 (1978); Restatement
(Third) of Restitution and Unjust Enrichment § 2 cmt. b (2011).

It is also worth repeating that, at least as to the '293
patent, Alan received the same benefit for his financial
contributions that Glenn did for his inventive ones, i.e., a

45

co-ownership interest in the patent that allowed him to sell, license, or use it without his brother's participation.  See Part III.A.1, supra.  Though the court need not decide this issue, co-ownership of a patent between the person who accomplished the invention and the person who funded the work seems sufficiently "just" (especially to the funding partner) such that no rational factfinder could deem it "unconscionable."  In any event, Glenn is entitled to summary judgment on Alan's unjust enrichment claim (count 10) due solely to the lack of evidence that Glenn received any benefit at Alan's expense.  Glenn is likewise entitled to summary judgment on Alan's claim for constructive trust (count 16), insofar as it seeks a remedy for Glenn's unjust enrichment through his "misappropriation" of the intellectual property.[17]

### c.    Violation of § 358-A, interference with prospective contractual relations, and conspiracy

For much the same reasons, Glenn is also entitled to summary judgment on one of Alan's claims for violations of the Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A (count 12), one of Alan's claims for interference with prospective contractual relations (count 13), and his claim for conspiracy.

---

[17]As pled in the amended counterclaim, count 16 also seeks relief for Glenn's alleged misappropriation of Mii's relationship with Lovejoy.  That aspect of count 16 is discussed infra at Part III.C.2.

46

The § 358-A claim set forth as count 12 of the counterclaim alleges that Glenn's "representation that he is the source of the press technology and that he owns the intellectual property relating thereto constitutes a false designation of origin." Assuming, without deciding, that misrepresentations as to ownership of intellectual property are actionable under § 358-A,[18] there is no evidence that Glenn ever represented to Lovejoy or any of Mii's other actual or prospective customers that he "was the source of" or "owned" any intellectual property developed during his ventures with Alan or, for that matter, that such a claim would have been false. See Part III.A.1, supra. This gap is also fatal to Alan's claim for tortious interference with prospective contractual relations as set forth in count 13, alleging that Glenn accomplished this tort by "representing that [Glenn Beane LLC] and Glenn [] own the intellectual property."[19]

_____

[18]As Glenn points out, the Consumer Protection Act specifically prohibits false designations of source as to "goods or services" only, N.H. Rev. Stat. Ann. § 358-A:2, II, and intellectual property is not included in that phrase--at least as it appears in the analogous provision of the Lanham Act, 15 U.S.C. § 1125, as this court noted in dismissing the Beanes' prior lawsuit in this court. Beane v. Beane, 2008 DNH 082, 4. The court need not and does not decide whether a similar limitation applies to § 358-A.

[19]This claim also fails because there is no evidence that anything Glenn said to Lovejoy or any other customer--whatever it was--caused Mii to lose any actual or prospective contractual relationships. See infra Part III.C.2.

47

Alan's memorandum in opposition to summary judgment asserts that Glenn violated the Consumer Protection Act through other conduct, including "block[ing] the Fleet loan, caus[ing] Mii to breach or be unable to perform the Lovejoy contract and then tak[ing] Mii's customers and property paid for by [Alan]."  This assertion is safely ignored, since it is not further developed. See, e.g., Higgins v. New Balance Athletic Shoe, 194 F.3d 252, 261 (1st Cir. 1999).  As best the court can understand it, though, it does not state any supportable § 358-A claim anyway.

First, the only evidence of any "property" that Glenn "took" is his re-assignment of the '293 patent, and that did not violate the rights of either Alan or Mii, as already discussed.  See Part III.A.1, supra.  (Even as to Materials, the re-assignment was at worst a breach of the assignment agreement on the theory that Glenn failed to provide the required notice of termination, see id., a transgression that cannot support a § 358-A claim regardless, see, e.g., Barrows v. Boles, 141 N.H. 382, 390 (1996)).  Second, no rational factfinder could conclude that Glenn's handling of the Lovejoy contract for Mii was even grossly negligent, let alone unfair or deceptive, or that Glenn's dealings with Lovejoy or other customers after he left Mii were tortious.  See infra Parts III.C.1-2.  Third, assuming that the charge of Glenn's "blocking the Fleet loan" refers to his refusal

48

to provide Alan with the requested assurance that "all intellectual assets that have been or will be created by Glenn . . . and relate to [Mii's] business have been or will be assigned to Mii," see Part II.A.4, supra, no rational factfinder could conclude that Glenn had assigned any intellectual property to Mii, or had any obligation to do so, see Part III.A.2.a, supra (and, as just noted, Glenn's simple breach of any such obligation could not amount to a § 358-A violation as a matter of law anyway, see Barrows, 141 N.H. at 390).

Lastly, Glenn is entitled to summary judgment on Alan's claim for a conspiracy between Glenn and Glenn Beane LLC "to take the Intellectual Property developed, commercialized, and patented by Mii with Alan Beane's money" (count 14).  There is neither any evidence of intellectual property developed or patented during Glenn's time at Mii so that Mii could potentially have some right to it, see Part III.A.2.a, supra, nor that Glenn or Glenn Beane LLC "took" or even used any such intellectual property, see Part III.A.2.a, supra.  (The sole exception is the '293 patent, but, again, nothing Glenn did ever deprived Alan of his co-ownership of that.)  Glenn is entitled to summary judgment on counts 12 (violation of § 358-A), 13 (tortious interference with prospective contractual relations), and 14 (conspiracy).

49

**B.   Misappropriation of confidential information and trade secrets**

Alan's claims for misappropriation of confidential information (count 6) and trade secrets (count 7) are, to put it charitably, poorly conceived.  The "confidential information" claim alleges that Glenn "acquired information relating to the business of Mii during the course of his employment by Mii," including "knowledge of powder metals and powder metal compaction presses," then "used the confidential information of Mii to misappropriate the business of Mii."

As Glenn points out, however, the New Hampshire version of the Uniform Trade Secrets Act "displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret."  N.H. Rev. Stat. Ann. § 350-B:7, I.  As Glenn further points out, this "essentially creates a system in which information is classified only as either a protected trade secret or unprotected general knowledge," and that, as a result, New Hampshire law "no longer protects confidential information from mere misuse unless it is a statutory trade secret."  Mortg. Specialists, Inc. v. Davey, 153 N.H. 764, 789 (2006).  Alan has no claim for misappropriation of confidential information, then, unless that information qualifies

as a "trade secret" under New Hampshire's version of the Uniform
Trade Secrets Act.[20]

As Glenn also points out, Alan has not demonstrated a
genuine issue of material fact that any of the "information" that
Glenn allegedly misappropriated meets the statutory definition of
trade secret.  Under the Trade Secrets Act, a trade secret is:

> information, including a formula, pattern, compilation,
> program, device, method, technique, or process, that:
>
> (a) Derives independent economic value, actual or
> potential, from not being generally known to, and not
> being readily ascertainable by proper means by, other

---

[20]Alan points out that, under the Limited Liability Company
Act, "[e]very member and manager must account to limited
liability company and hold as trustee for it any unfair or
unreasonable profit or benefit derived by that person from" his
"use . . . of confidential or proprietary information of the
limited liability company or other matters entrusted to the
member as a result of such status." N.H. Rev. Stat. Ann. § 304-
C:31, V(b)(2).  Under this provision, Alan argues, Mii has a
claim against Glenn for using the confidential information
entrusted to him, and that claim is not pre-empted by the Trade
Secrets Act.  In Mortgage Specialists, however, the New Hampshire
Supreme Court ruled that the Trade Secrets Act preempted the
plaintiff's claim that it "entrusted [its employees] with
confidential . . . information, that trust gave rise to a
fiduciary duty in them, and . . . they breached that duty" when
they "took and used" the confidential information for their own
benefit. 153 N.H. at 781-82.  That theory is indistinguishable
from Alan's.  In any event, even if the Trade Secrets Act did not
pre-empt Alan's claim against Glenn for misappropriation of
confidential information--under the Limited Liability Company Act
or otherwise--that claim would still fail because (i) there is no
evidence that Glenn used Mii's confidential information in his
post-resignation dealings with Lovejoy, see infra this Part, and
(ii) Glenn was no longer a "member" at that point, so § 304-C:31,
V(b)(2) did not apply to him, see infra Part III.C.2.

persons who can obtain economic value from its
disclosure or use; and

> (b) Is the subject of efforts that are reasonable
> under the circumstances to maintain its secrecy.

N.H. Rev. Stat. Ann. § 350-B:1, IV.  Alan has failed to create a

genuine issue as to whether any of the claimed trade secrets

satisfy either part of this definition.

Alan's amended counterclaim asserts simply that "Mii

maintains certain trade secrets in connection with its business,"

without describing them any further.  Alan's summary judgment

memorandum does not go much beyond that, asserting that Mii had

trade secrets in its "commercializable technology" as listed in

one of Alan's interrogatory responses.[21]  That response

identifies the alleged trade secrets at issue as:

> A.   Manufacturing system control software source and
> execution codes and operating documentation kept in
> hard copy, electronic record form and on Mii computers.

---

[21]In discussing his trade secrets claim, Alan also refers to
"patents and patent rights."  But, as he correctly acknowledges,
"the patent process route to intellectual property protection
[is] the antithesis of the trade secret approach"--with the
result that information contained in publicly filed patents and
patent applications cannot be a trade secret.  See, e.g., Tewari
De-Ox Sys., Inc. v. Mountain States/Rosen, L.L.C., 637 F.3d 604,
611-12 (5th Cir. 2011).  Of course, any claim for Glenn's use of
Mii's patents (and it is not clear what those are, since the only
patents referenced in anything in the record were issued to Glenn
and other individuals and assigned to Materials, not to Mii)
would have to sound in patent infringement, and no such claim
appears among the 21 counts of the amended counterclaim.

      B.   The electronic and hard copy database of all commercializable work product created by all of the Mii companies' employees.

      C.   The electronic and hard copy data base of all Mii's vendors including everything required to engage with them to replicate or improve upon the work product of Mii vendor contracts.

      D.   The electronic and hard copy data base of all of Mii's customers, including potential customer contacts, including everything required to engage with them or replicate or improve upon those business and technical relationships.

      E.   The entire engineering and tooling design data base including the information necessary to replicate or improve upon every material, part or manufacturing system product ever conceived and constructed by the Mii companies.

Essentially, this amounts to an assertion that every piece of information ever created by Mii amounts to a trade secret.

Needless to say, the protections of the Uniform Trade Secrets Act are considerably narrower than that. Indeed, a company cannot sustain a claim under the Act by "effectively asserting that all information in or about its [product] is a trade secret. That's not plausible--and, more to the point, such a broad assertion does not match up to the statutory definition." IDX Sys. Corp. v. Epic Sys. Corp., 285 F.3d 581, 583 (7th Cir. 2002); see also Sutra, Inc. v. Iceland Express, EHF, No. 04-11360, 2008 WL 2705580, at *4 (D. Mass. July 10, 2008).

Alan makes no effort to explain how any of the
extraordinarily broad categories of information set forth in his
interrogatory answer have any of the attributes of trade secrets
under the Act, i.e., they have independent economic value derived
from their secrecy, they are not readily ascertainable by others
by proper means, and they are subject to reasonable efforts to
maintain their secrecy.[22]  For this reason, Glenn is entitled to
summary judgment on Alan's claim for misappropriation of trade
secrets.  See IDX Sys., 285 F.3d at 583-84; Sutra, 2008 WL
2705580, at *4-*5; cf. Contour Design, Inc. v. Chance Mold Steel
Co., No. 08-451, 2010 WL 4774283, at *5 n.2 (D.N.H. Oct. 22,
2010) (refusing to recommend a preliminary injunction based on a
trade secrets claim where "plaintiff has not . . . identified

_____

[22]On this last point, Alan's statement that "Mii entrusted
the safeguarding and protection of Mii's trade secrets to Glenn,"
who "insisted on being the sole integrative repository of Mii's
aggregate commercializable technologies," is yet another
conclusory assertion that does not suffice to create a genuine
issue of material fact.  Indeed, this assertion is contrary to the
balance of the interrogatory answer, which states that much
the information was kept in an "electronic and hard copy data
base"--without even mentioning, of course, what "reasonable
efforts" Mii took to maintain the secrecy of those files.  Alan's
summary judgment memorandum misses this point entirely, arguing
at length that, because of Glenn's status as Mii's member and
manager, it was entitled to assume that he would safeguard any
confidential information that he learned in that capacity.  Even
if that is true, it does not answer the question of whether the
information was a trade secret in the first place because, among
other things, it was reasonably protected from disclosure by
anyone at the company who learned of it, not just Glenn.

with reasonable specificity the trade secrets that [defendant]
allegedly misappropriated") (McCafferty, J.), rep't & rec.
adopted, 2010 WL 4736428 (D.N.H. Nov. 12, 2010), aff'd, 649 F.3d
31 (1st Cir. 2011).  The court grants Glenn's motion for summary
judgment on counts 6 (misappropriation of confidential
information) and 7 (misappropriation of trade secrets).[23]

**C.   Breach of fiduciary duty and tortious interference**

In addition to his charge that Glenn misappropriated Mii's
intellectual property, Alan's other principal complaint is that
Glenn mismanaged the company's relationship with Lovejoy during
his time there and then, after leaving Mii, took the relationship
(as well as Mii's relationships with other potential customers)
for himself.  This is the premise of Alan's claims for breach of
fiduciary duty (counts 3-5), tortious interference with
contractual relations (count 8), his remaining claim for tortious
interference with prospective contractual relations (count 9),

---

[23]In his memorandum supporting his summary judgment motion,
Glenn also requests attorneys' fees under the Trade Secrets Act,
which allows the court to award them to the prevailing party when
"[a] claim of misappropriation is made in bad faith."  N.H. Rev.
Stat. Ann. § 350-B:3, I.  Under this court's rules, however,
requests for separate and distinct relief (e.g., for summary
judgment and for attorneys' fees) cannot be combined in a single
motion.  L.R. 7.1(a).  So Glenn's request for fees is denied.

and part of his claim for "constructive trust and specific performance" (count 16).

As Alan appears to acknowledge, however, Glenn has no liability to either Mii or Alan for actions taken while he was still a member or manager of the limited liability company unless they amounted to "gross negligence or willful misconduct." N.H. Rev. Stat. Ann. §§ 304-C:31, IV-V.  As fully explained infra at Part III.C.1, Alan has not demonstrated a genuine issue as to whether Glenn's handling of the Lovejoy relationship on behalf of Mii amounted to gross negligence or willful misconduct. Furthermore, as fully set forth infra at Part III.C.2, Alan has not explained how Glenn retained any duties to Mii (or Alan) following Glenn's resignation from Mii in March 2004.  That shortcoming aside, moreover, Glenn's subsequent dealings with Lovejoy neither breached any such duties, nor are otherwise actionable, because there is no dispute that Lovejoy initiated its dealings with Glenn only after Mii had admitted it would be unable to make Lovejoy's press function properly and abandoned the relationship.

### 1.   Glenn's handling of Lovejoy while at Mii

Two of Alan's claims for breach of fiduciary duty arise out of Glenn's alleged mismanagement of Mii's relationship with

Lovejoy (counts 3 and 5).  Both allege, in essence, that Glenn
"took actions that resulted in disputes between Mii and Lovejoy
that caused the loss of payments by Lovejoy under the contract to
Mii and the loss of Mii's future business opportunities with
Lovejoy."  Alan acknowledges that Glenn's duties as a manager and
member of Mii are established by the relevant provisions of New
Hampshire's Limited Liability Company Act.  Those provisions
state, in relevant part:

> IV.  A member or manager shall be liable, responsible,
> and accountable in damages or as otherwise provided by
> law to the limited liability company or to the members
> of the limited liability company for any action taken
> or failure to act on behalf of the limited liability
> company, if such act constitutes gross negligence or
> willful misconduct.
>
> V.   Subject to the liability of a member or manager
> for acts of gross negligence or willful misconduct
> provided for in paragraph IV, and unless otherwise
> provided in the limited liability company agreement:
>
> > (a) A member or manager shall not be liable,
> > responsible or accountable in damages or as
> > otherwise provided by law to the limited liability
> > company or to the members of the limited liability
> > company for any action taken or failure to act on
> > behalf of the limited liability company.

N.H. Rev. Stat. Ann. § 304-C:31.  In so many words, then, the
manager or member of a limited liability company is not liable to
it or to its members for his actions or inaction on its behalf,

unless they amount to gross negligence or willful misconduct.[24]
See Todd v. Sullivan Constr. LLC, 191 P.3d 196, 202 (Idaho 2008)
(applying similar provisions of Idaho's LLC act).

Neither party attempts to define the phrase "gross
negligence or willful misconduct" as it appears in the Limited
Liability Company Act, nor is there any New Hampshire case law
expounding upon it. But this court recently had occasion to
interpret the phrase as it appeared in a similar context--the
indemnification provision of a private agreement that limited
liability to the indemnitor's "willful misconduct or gross
negligence." Lifespan Corp. v. New Eng. Med. Ctr., Inc., 2011
DNH 083, 18 (applying Massachusetts law). There, this court
observed that "'gross negligence' means 'very great negligence,
or the absence of slight diligence, or the want of even scant
care.'" Id. at 18 (quoting Altman v. Aronson, 121 N.E. 505, 506
(Mass. 1919)). This court further observed that "willful
misconduct" was an even higher standard, limited to "misconduct
that is either intentional or involves 'such recklessness as is
the equivalent of intent,' and carries a 'great chance' of
causing harm to another." Id. (quoting Dillon's Case, 85 N.E.2d
69, 74 (Mass. 1949)). In the absence of any guidance from the

_____

[24]The Mii limited liability company agreement does not
"otherwise provide."

parties, this court will apply these standards--which are
formidable--to Alan's claim under the identical language of the
relevant provisions of the Limited Liability Company Act.

Alan asserts that, during Glenn's time at Mii, his handling
of the company's relationship with Lovejoy amounted to gross
negligence or willful misconduct in that he (a) "negotiat[ed] or
enter[ed] into the contract knowing that it could not be
fulfilled," (b) "fail[ed] to design and manufacture the Lovejoy
presses as required by the contract," and (c) "exhaust[ed] the
resources of Mii by causing more than $500,000 in easily
avoidable engineering errors."[25]   Alan has failed to come forward
with evidence creating a genuine dispute as to whether any of
these actions constituted "gross negligence or willful
misconduct" on Glenn's part.

First, there is simply no evidence that Glenn caused Mii to
enter into the contract with Lovejoy "knowing that it could not
be fulfilled" or failed to see that Mii honored the contract.   As

---

[25]Alan cites further examples of Glenn's alleged gross
negligence or willful misconduct, including (d) "abandoning the
company in the middle of its problems with Lovejoy,"
(e) "blocking the Fleet loan by refusing to acknowledge the
exclusive license rights to the technology," and (f) "helping
Lovejoy so that it did not need to honor its commitments to Mii,
and taking the Lovejoy relationship for himself."   These theories
also fail, for the reasons discussed: (d) infra at Part III.D,
(e) at Part III.A.2.c, supra, and (f) infra at Part III.C.2.

an initial matter, there is no evidence as to what Glenn even
committed Mii to do in the contract, because Alan has failed to
provide a copy of it.  Without the contract, of course, no
rational factfinder could conclude that Mii failed to honor it,
let alone that such a failure resulted from Glenn's gross
negligence or willful misconduct.  (It is also worth noting
Alan's claim that, even before Glenn left Mii, Lovejoy's system
"fully met the contract specifications," see note 3, supra,
which--to put it mildly--seems inconsistent with Alan's argument
that Glenn caused Mii to breach the contract.)  Nor is there any
evidence that, whatever that commitment was, Glenn "knew" that
Mii would not be able to deliver on it (and it is worth noting
that Alan himself participated in negotiating the contract with
Lovejoy, see Part II.A.3, supra, and therefore would seem to be
at least as responsible as Glenn for any problems in the
resulting agreement).

Instead, taken in the light most favorable to Alan, the
record shows only that, after the contract was signed, Glenn had
discussions with Mii that eventually led to a misunderstanding
with Lovejoy about whether Mii had agreed to new contractual
specifications, viz., the "fluidization component," see Part
II.A.3, supra, and, if so, whether those specifications served to
modify the existing contract at no extra cost to Lovejoy or

amounted to "a time and materials addition," see Part III.A.5, supra.[26]  There is no evidence that Glenn in fact agreed to the new specifications:  to the contrary, Alan himself insists that "[t]here is no paperwork or documentation available to Mii that would substantiate such a contractual commitment."  Alan does not explain how talking to a customer about modifications to a forthcoming product--but without agreeing to make them--could amount to near "gross negligence or willful misconduct," even if the customer walks away from those discussions with the understanding that such a commitment has been made.

Furthermore, even if Glenn had committed Mii to delivering on new specifications, there is no evidence that he knew (or even should have known) Mii would be unable to do so.  To the contrary, Alan himself states that "Mii realized" that it had technology that, with modifications, "might" suffice to meet

---

[26]This is itself an exceedingly generous reading of the record.  Not only is there no evidence of the provisions of the Mii-Lovejoy contract, as just noted, but there is also no evidence of anything in particular that Glenn actually told Lovejoy.  There is only Alan's reference to "many conversations between Glenn" and Lovejoy about "the perceived necessity to upgrade the capabilities of the system" as those conversations are reflected in "Mii's email files"--which have not been provided.  In light of these gaps in the record, no rational factfinder could even accept the premise of Alan's theory that Glenn was grossly negligent in his dealings with Lovejoy, i.e., that he said something that he knew or should have known Lovejoy would take as a commitment to provide the upgrade.

those specifications.  Alan does not explain how committing the
company to execute on a difficult--but not impossible--project
amounts to "gross negligence or willful misconduct."  (It should
be noted here that, in a further inconsistency between Alan's
gross negligence claim and his own account of Mii's dealings with
Lovejoy, Alan claims that Mii was ultimately able to deliver on
the new specifications anyway, see note 5, supra.)  Based on the
evidence provided by Alan, as augmented by all reasonable
inferences in his favor, no rational factfinder could conclude
that Glenn acted with "the want of even scant care," let alone
recklessly, in negotiating the Lovejoy contract or causing Mii to
breach it.

        Second, there is also no evidence from which a rational
factfinder could conclude that Glenn was grossly negligent or
worse "by causing more than $500,000 in easily avoidable
engineering errors" in designing the press for Lovejoy.  The only
support for this claim comes from the statements in Alan's
declarations that Glenn "circumvented" Mii's "detail design
engineering relationship" with an outside engineering firm "by
essentially engaging [its] assistance in mechanical drafting as
opposed to engineering oversight" and that Glenn misdesigned "the
clearances between the outer walls of the inner cylinder
components and the inner walls of the outer cylinder components,"

62

so that "thermal expansion" caused them to touch, resulting in
"catastrophic press failure."  See Part II.A.3, supra.

But Alan points to no evidence even remotely suggesting a
standard of care that would demand "engineering oversight" by an
outside firm, nor that would exclude the kind of design error
made by Glenn.  Indeed, the standard of care for designing what
Alan himself calls "a very sophisticated 8 level, 1000 ton
pressing system" is "so distinctly related to some science,
profession, business or occupation as to be beyond the ken of
average layman" and, therefore, requires expert testimony to
prove it.  Lemay v. Burnett, 139 N.H. 633, 635-36 (1995)
(affirming dismissal of claim that defendant had negligently
designed a swimming pool for want of expert testimony).  Alan
would also need expert testimony to show that the additional
costs of designing the press resulted from these errors, as
opposed to other factors (such as the improper design of the
cooling system by a third party, see Part II.A.3, supra).  See,
e.g., Bartlett v. Mut. Pharm. Co., 731 F. Supp. 2d 184, 188-89
(D.N.H. 2010).  Alan has not come forward with any such testimony
or, for that matter, anything more than a few statements in his
own declaration blaming Glenn for mistakes in designing the
press.  These statements are insufficient to sustain a claim for
negligence, let alone for gross negligence or willful misconduct.

63

Alan also suggests another theory of "willful misconduct" by Glenn.  In one of his declarations, Alan states that, "[i]n my opinion, based on my knowledge of Lovejoy, [its principal] Hennessy, Glenn Beane and the events, I believe that Glenn and Lovejoy contrived a pattern of conduct that ended up with their joint co-opting of Mii's business opportunity."  So far as the court can tell, Alan's theory is essentially that Glenn, while still at Mii, agreed that it would provide the fluidization system "as a no charge deliverable to the original purchase order" from Lovejoy, without telling Alan or anyone else at Mii, then "deliberately engineered" Mii's failure to provide that component even though it could have.  This enabled Glenn, after resigning from Mii, to hold off on "step[ping] into the Lovejoy situation until he was certain that Mii had essentially solved the problems [so] that his effort, if any, would be minor, but his ability to claim credit major."

Most importantly, Alan says, this scheme allowed Glenn to "appropriate all or some of [Mii's] value to himself without ever having to provide a return on account of [Alan's] investment." Alan ventures that Glenn hatched the scheme after he and their brother David, as part of their efforts to find a potential new investor or buyer for Mii, arrived at a valuation in excess of $60 million (this was all done, Alan says, without his knowing).

64

Alan "believe[s] that 5 seconds after Glenn saw" this valuation, "he undertook to engineer the failure of the company."

This theory gets high marks for creativity and, if proven, would almost certainly amount to the sort of "willful misconduct" actionable under § 304-C:31, IV.  But, as reflected in Alan's own characterization of the theory as his "opinion" and "belief," there is absolutely no proof of any such nefarious agreement between Glenn and Lovejoy.  The theory is also inherently implausible because, among other reasons, it fails to explain why Lovejoy would willingly suffer a lengthy delay in the delivery of a sophisticated piece of machinery it needed for its business at no apparent benefit to itself, but merely to help Glenn and harm Alan.  (This would include the several weeks after Lovejoy learned of Glenn's departure that it continued working on the press with Alan and Mii--a period of cooperation that ended only when Alan announced that Mii was quitting and then stopped returning Lovejoy's calls and e-mails, see Part II.A.6, supra).  Alan's willingness to sign a declaration "swearing" to this theory, then, does not create a genuine issue of material fact.  Glenn is entitled to summary judgment on Alan's claims for breach of fiduciary duty (counts 3 and 5) insofar as they arise out of Glenn's mishandling of Mii's relationship with Lovejoy.

## 2.   Glenn's relationship with Lovejoy following his resignation from Mii

As already noted, one of Glenn's claims in this case was that his membership in Mii terminated as of February 4, 2004, the day he provided a letter announcing his resignation from that position, among others.  See Part II.A.5, <u>supra</u>.  Alan eventually agreed to this fact, during a conference with the court, and this court entered judgment for Glenn on that claim accordingly.  <u>See</u> Part II.B.2, <u>supra</u>.  Glenn argues that, when his membership in Mii ceased, so did any of his duties to either Mii or Alan, so they have no claim against him for his dealings with Lovejoy after his resignation, whether styled as a claim for breach of fiduciary duty, tortious interference, or otherwise.

Alan's summary judgment memorandum does not directly address this point, arguing instead that Glenn's resignation from his role as Mii's <u>manager</u> did not terminate his duties to the company, because, as just discussed, the provisions of the Limited Liability Act impose duties on members as well.  By their terms, however, those provisions apply only to a "member," not to a former member.  <u>See</u> N.H. Rev. Stat. Ann. §§ 304-C:31, IV-V.  This includes the provision on which Alan most heavily relies, § 304-C:31, V(b)(2).  That provision states that "[e]very <u>member</u>

. . . must account to the limited liability company and hold as trustee for it any unfair or unreasonable profit derived by that person" from "use by the <u>member</u> . . . of the company's property, including, but not limited to, confidential or proprietary information of the limited liability company or other matters entrusted to the . . . member as the result of such status." <u>Id.</u> § 304-C:31, V(b)(2) (emphases added).

Thus, by its terms at least, § 304-C:31, V(b)(2) does not apply to Glenn's dealings with Lovejoy after he left Mii, because he was no longer a "member" at that point.  (Of course, further problems with this claim, as already discussed, are the absence of evidence that Glenn used Mii's "confidential or proprietary information" in his post-resignation dealings with Lovejoy, <u>see</u> Part III.B, <u>supra</u>, and that such a claim appears to be pre-empted by the Trade Secrets Act, <u>see</u> note 20, <u>supra</u>.)  Nor, for that matter, does § 304-C:31, IV, which, as just discussed, imposes liability on a "member or manager"--not a former member or former manager--for gross negligence or willful misconduct.

Alan does not provide any other authority for the proposition that, after Glenn resigned from Mii, he continued to owe Mii, or Alan, any duty preventing Glenn from doing business with Lovejoy or any of Mii's other customers.  The amended counterclaim asserts several other bases of a "confidential

relationship" between Alan and Glenn, i.e., (i) their kinship, (ii) the Mii limited liability company agreement, (iii) unspecified "New Hampshire law," and (iv) Alan's "justifiable belie[f] that [Glenn] would act in their best interests."  But the Mii limited liability company agreement, like the Act itself, does not impose any duties on former members.

Alan's remaining assertions seem to suggest "[t]he basic confidential relationship [that] arises out of the family relationship, where one party is justified in believing that the other party will act in [his] interest."  Clooney v. Clooney, 118 N.H. 754, 757 (1978).  But that "relationship generally is marked by a disparity in position," id. (citing 4 George G. Bogert, Trusts and Trustees § 482 (rev. 2d ed. 1978)), which was not the case here, where Alan and Glenn had equal ownership interests and roles in the management of Mii.  Indeed, as the current version of the treatise cited in Clooney explains, "kinship alone . . . does not itself establish a confidential relationship.  In fact, often relatives are hostile to each other or deal at arm's length and act independently and thus are held not to have been in a confidential relationship."  24 George G. Bogert et al., Trusts and Trustees § 482 (rev. 3d ed. 2009) (footnotes omitted).  That was manifestly the case here.  There was no familial confidential relationship as a matter of law.

68

Furthermore, in his surreply, Alan appears to retreat from his theory that Glenn continued to owe him a duty after leaving Mii, emphasizing that "[t]he vast majority of the misconduct complained of by Mii and Alan occurred while Glenn was a . . . member of . . . Mii . . . , not after his resignation."[27] Because Alan has failed to identify any basis for Glenn's continuing duties to Mii (or Alan) following Glenn's resignation from the company, Glenn is entitled to summary judgment on the claims that he breached his fiduciary duty to Mii (or Alan) in his post-resignation dealings with Lovejoy, as well as Alan's claim for a constructive trust based on Glenn's misappropriation of the Lovejoy relationship.

Furthermore, even if, after withdrawing from Mii, Glenn retained some duty to keep away from its ongoing customer relationships, he did not breach that duty.  It is undisputed that, after Glenn had withdrawn--but before he had any further dealings with Lovejoy--Mii abandoned its relationship with Lovejoy when Alan announced that Mii "could not make the press work, was not going to continue trying, and lacked funding to do so" and, for that matter, stopped returning Lovejoy's e-mails and

---

[27]The ellipses reflect omissions of Alan's reference to Glenn's role as an officer and shareholder of Materials which are immaterial because, again, Materials is not a party here.

calls.  See Part II.A.6, supra.  Of course, "[w]hen a corporation is unable to avail itself of an opportunity, its employee, officer or director is free to exploit it."  Energy Resources Corp. v. Porter, 438 N.E.2d 391, 394 (Mass. App. Ct. 1982); see also, e.g., 3 William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 862.10, at 225 (rev. ed. 2010).

There is no reason to believe that this limitation on the duties of former corporate officers or directors would not also apply to the duties (if any) of the former manager or member of a limited liability company.  Cf. Sherman v. FSC Realty LLC (In re Brentwood Lexford Partners, LLC), 292 B.R. 255, 273 (Bkrtcy. N.D. Tex. 2003) (finding that managers of LLC did not breach their fiduciary duty to it by resigning and transferring some of its business to a new entity after LLC's lender had accelerated its loan and filed suit to collect it, essentially leaving the LLC unable to do business).  Mii's renunciation of its contract with Lovejoy, then, relieved Glenn of any duty he had to refrain from dealing with Lovejoy for his own benefit as a consequence of his former role as Mii's manager or member--and, again, it is undisputed that, following his resignation, Glenn had no further dealings with Lovejoy until after Mii "had failed to meet [its] obligations," at least in Lovejoy's eyes, see Part II.A.6, supra.

So, even if Glenn had post-resignation duties to Mii, he did
not breach them.  This entitles him to summary judgment not only
on counts 4 (the remaining claim for breach of fiduciary duty)
and 16 (the claim seeking a constructive trust over the Lovejoy
relationship) but also counts 8 and 9 (the claims for intentional
interference with the Lovejoy contract and intentional
interference with Mii's prospective relationships with other
customers).  To prevail on the intentional interference claims,
Alan must show, among other things, that Glenn's improper actions
induced Lovejoy to breach its contract with Mii, or induced the
other customers not to do business with Mii.  See, e.g., Montrone
v. Maxfield, 122 N.H. 724, 726 (1982).  As just discussed,
though, after Glenn resigned from Mii, he had no dealings with
Lovejoy until after Alan had told it that Mii "could not make the
press work, was not going to continue trying, and lacked funding
to do so," and Lovejoy "considered the contract terminated."  See
Part II.A.6, supra.

Alan has not come forward with any evidence disputing this
chronology, which is fatal to his claim for intentional
interference with the Lovejoy contract.  Nor has Alan come
forward with any evidence that Glenn had any contact whatsoever
with the other potential customers of Mii identified in the
amended counterclaim (here, again, Alan's summary judgment

71

memorandum asks the court to "infer from the fact that Glenn does not state under oath that he did not engage in discussions with them that [he] caused them to decide not to do business with Mii," which is not a recognized method of proof in modern judicial practice, see Part III.A.1.b, supra).  Glenn is entitled to summary judgment on Alan's claims for intentional interference with actual and prospective contractual relations (counts 8-9).

### D.   "Wrongful dissociation"

Alan claims that Glenn's withdrawal from Mii in February 2004 amounted to "wrongful dissociation" under the Limited Liability Company Act because it was prohibited by the Mii limited liability company agreement (count 15).  As Alan points out, the Limited Liability Company Act provides that if a member's "withdrawal is a breach of the limited liability company agreement . . . the company may recover from the withdrawing member damages for breach of the limited liability company agreement . . . , including the costs of any services the withdrawn member was obligated to perform."  N.H. Rev. Stat. Ann. § 304-C:27, III.  The Mii limited liability company agreement expressly provides that "[n]o member has power to withdraw by voluntary act from the Limited Liability Company."

Despite this provision, Glenn moves for summary judgment on the wrongful dissociation claim, arguing that (1) his withdrawal was not "voluntary," but compelled by Alan's actions, particularly his exercise of dominion over Mii's assets pursuant to the security agreement, see Part III.A.5, supra, and (2) in any event, Alan did not suffer any damages as a result of Glenn's withdrawal from membership in Mii.  The court need not reach the first argument because the second one is correct.

Squarely presented with Glenn's argument that his "wrongful dissociation" did not cause Mii any damages, Alan has not identified any.  Importantly, while § 304-C:27, III, allows a limited liability company to recover, as damages for a member's withdrawal in breach of the limited liability company agreement, "the costs of any services the withdrawn member was obligated to perform," Alan does not point to any provision of the Mii agreement that required Glenn to render any services to the company by virtue of his membership in it.

Thus, Alan's otherwise unexplained statement in his sur-reply that Glenn resigned "without fulfilling his contribution obligations" does not make out a claim, for wrongful withdrawal or otherwise, because the Mii limited liability company agreement did not impose any such obligations.  See Federalpha Steel LLC Creditors' Trust v. Fed. Pipe & Steel Co., 368 B.R. 679, 688

73

(N.D. Ill. 2006) (dismissing LLC's claim against member for failing "to contribute property or services" where the LLC agreement imposed no such duty).  Indeed, in characterizing the parties' arrangement, Alan himself states that Glenn received a "co-equal" interest in Mii "without the necessity of having to come up with any cash equity."  See Part II.A.1, supra.

Alan's real complaint over Glenn's withdrawal seems to be that he "abandon[ed] the company in the middle of its problems with Lovejoy."  See note 25, supra.  But there was nothing in the limited liability company agreement--or, for that matter, any other agreement--that obligated Glenn to continue serving as Mii's employee, as opposed to its member (a role that, as just discussed, did not come with any obligations to render services to the company).  Nor did the limited liability company agreement obligate Glenn to continue serving as Mii's manager.  See Part II.A.1, supra.  Thus, the only provision of the limited liability agreement that Glenn violated by withdrawing was the prohibition on voluntary withdrawal itself, and Alan has not identified any damages that followed from that withdrawal.  Cf. Federalpha Steel, 368 B.R. at 690 (recognizing claim for wrongful dissociation based on member's "ceasing participation in [the LLC's] management [and] ceasing honoring its duties and obligations under the LLC agreement").  Glenn is therefore

entitled to summary judgment on Alan's wrongful dissociation claim (count 15).

### E.   Relief for Glenn's ERISA claim

Finally, Alan's amended counterclaim includes three separate counts seeking relief for having to respond to the claim for equitable relief under ERISA that Glenn brought at the commencement of this lawsuit, but has since voluntarily dismissed.  See Part II.B.2, supra.  Alan asserts that this claim, which alleged that Glenn faced potential liability because Alan had refused to make certain filings necessary to terminate the ERISA plans benefitting the employees of Materials and Mii, "had no basis in law [or] fact," because the plans' third-party administrator had agreed to make the necessary filings.  Thus, Alan argues, he is entitled to recover his resulting "attorneys' fees, costs, and expenses" under New Hampshire law, including the Consumer Protection Act, N.H. Rev. Stat. Ann. § 358-A:10, I (count 18), another statute providing for attorneys' fees in "contract or tort" actions, id. § 507:15 (count 19), and the common-law, specifically, the decision in Harkeem v. Adams, 117 N.H. 687 (1977) (count 20).

These state laws have no application here.  ERISA preempts "any and all State laws insofar as they may now or hereafter

relate to any employee benefit plan," 29 U.S.C. § 1144(a), and "[t]he term 'State law' includes all laws, decisions, rules, regulations or other State action having the effect of law, of any State," id. § 1144(c)(1).  "A state law can be considered 'related to' a benefit plan--and thus preempted--'even if the law is not specifically designed to affect such plans, or the effect is only indirect.'" Zipperer v. Raytheon Co., 493 F.3d 50, 53 (1st Cir. 2007) (quoting Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 139 (1990) (further quotation marks omitted)).  ERISA's preemptive force extends to, among other state laws, those establishing "causes of action that provide alternative mechanisms to ERISA's own enforcement scheme." Id. (citing N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 658-59 (1995)).

The state statutes and decisional law that Alan invokes to recover against Glenn for bringing the ERISA claim fit comfortably within this category.  ERISA contains its own provision for attorneys' fees and costs, which states that "[i]n any action under this subchapter by a participant, beneficiary, or fiduciary, the court may in its discretion allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1) (parenthetical omitted).  As an action by a fiduciary under § 1132(a)(3)(B)(ii), Glenn's ERISA claim here is

subject to this fees and costs provision--which, by its terms, authorizes Alan to recover his expenses of successfully defending against that claim (if such an award would be appropriate, an issue the court need not and does not reach because Alan has not invoked § 1132(g)(1) among the 21 counts of his counterclaim).

Because ERISA provides its own way for a party to collect the fees and costs incurred in actions to enforce § 1132 of the statute, Alan cannot invoke the "alternative mechanisms" of New Hampshire law to that effect.  Indeed, as this court has previously observed, courts have "consistently held that ERISA pre-empts requests under state law for attorney's fees incurred in litigating an ERISA action."  Geaghan v. Prudential Ins. Co. of Am., 2009 DNH 178, 8 (citing Moffett v. Halliburton Energy Svcs., Inc., 291 F.3d 1227, 1237 n.6 (10th Cir. 2002) and S.F. Culinary, Bartenders & Svc. Employees Welfare Fund v. Lucin, 76 F.3d 295, 297-99 (9th Cir. 1996)).  Accordingly, Alan's claims under New Hampshire law to recover the "attorneys' fees, costs, and expenses" of defending Glenn's ERISA claim--including § 358-A (count 18), § 507:15 (count 19) and the common-law doctrine recognized in Harkeem v. Adams, supra (count 20)--are preempted. Glenn is therefore entitled to summary judgment on those claims.

IV.  **Conclusion**

For the reasons explained <u>supra</u>, Glenn's motion for summary judgment[28] is GRANTED as to counts 1-16 and 18-20 of Alan's amended counterclaim.  The remaining counts of the amended counterclaim, counts 17 and 21, are DISMISSED as moot per Alan's agreement, <u>see</u> Part II.B.1, <u>supra</u>.  Glenn's motion to dismiss[29] the amended counterclaim is DENIED as moot.

This court has already disposed of counts 1-4 of Glenn's amended complaint.  <u>See</u> Order of March 22, 2010 (document no. 70).  This court abstains from exercising any jurisdiction it has over Glenn's sole remaining claim, count 5, which alleges that Mii fraudulently transferred $150,000 to Alan by directing that Lovejoy make payment to Alan, rather than to Mii, for the purchase of certain equipment in March 2005.  The ownership of those funds--currently held by a third-party law firm--is the subject of an interpleader action pending, and about to go to trial (if it has not already) in the Grafton County Superior Court, <u>Lawson & Persson, P.C. v. Beane</u>, <u>supra</u>.  Accordingly, as this court recently ruled in rejecting jurisdiction over Glenn's attempt to execute a foreign judgment against those very same

---

[28]Document no. 84.

[29]Document no. 81.

78

funds, this court either lacks jurisdiction over them under the doctrine of prior exclusive jurisdiction or, if jurisdiction exists, should abstain from exercising it.  <u>Beane v. Mii Techs., L.L.C.</u>, 2012 DNH 023.

That resolves all of the 26 total counts in the amended complaint and amended counterclaim.  The clerk shall enter judgment accordingly and close the case.


**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  March 2, 2012

cc:  W.E. Whittington, Esq.
     William S. Gannon, Esq.